899 A.2d 1037 (2006)
386 N.J. Super. 208
STATE of New Jersey, Plaintiff-Appellant,
v.
Michelle L. ELDERS, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Ronald Stanley, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Tasha Jones, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Christopher Leach, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Anthony Graham, Defendant-Respondent.
State of New Jersey, Plaintiff-Appellant,
v.
Marcellius Love, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 2005.
Decided June 14, 2006.
*1039 Marcia L. Silva, Assistant Prosecutor, argued the cause for appellant (Bruce J. Kaplan, Middlesex County Prosecutor, attorney; Simon Louis Rosenbach, of counsel and on the brief).
Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for respondents (Yvonne Smith Segars, Public Defender, attorney; Mr. Friedman, of counsel and on the brief).
Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by
WECKER, J.A.D.
By leave granted, the State appeals an order granting motions on behalf of each defendant to suppress evidence seized after a consent search of a car on the New Jersey Turnpike on September 17, 2004.[1] The six co-defendants had been traveling in two cars from New York City in the early hours of the morning, headed for North Carolina, when one of the cars broke down. Two state troopers pulled over to assist. But defendants' reactions and inconsistent responses to the troopers' preliminary questions, as well as the condition of the vehicle itself, aroused the troopers' suspicions that criminal conduct or evidence of crime was involved.
Those suspicions led the troopers to request defendant Christopher Leach, who *1040 was in control of both vehicles, to consent to a search of the disabled vehicle. Leach orally consented, but initially refused to sign the consent form that was presented to him. Immediately after a trooper informed Leach that he did not have to consent, but that the trooper intended to call for a dog if he did not, Leach signed the consent form. A search of the disabled vehicle produced a half kilogram of cocaine and over fifty grams of marijuana. All six defendants were promptly arrested, and subsequent searches incident to arrest produced a small quantity of crack cocaine on defendant Michelle Elders; $8,000 in cash on defendant Ronald Stanley, and $3,000 cash on Leach.
After an evidentiary hearing on the motions to suppress all of the evidence seized,[2] the Law Division judge granted defendants' motions on the ground that the troopers did not have reasonable suspicion to seek Leach's consent to search the disabled car, as required by State v. Carty, 170 N.J. 632, 790 A.2d 903 (2002). The judge also found that even if the troopers did have reasonable suspicion to seek consent, the threat to call for a drug-sniffing dog made that consent involuntary, and evidence seized thereafter was inadmissible.
On appeal, the State first argues that Carty does not apply because the police did not initiate the highway stop. The State further argues that even if Carty does apply, the totality of the circumstances created reasonable suspicion that defendants were involved with unlawful activity and that one or the other vehicle was likely to contain contraband. Finally, the State maintains that Leach's consent was voluntary.
Defendants contend that nothing about their conduct while attempting to repair the disabled vehicle on the shoulder of the Turnpike was sufficiently unusual to arouse reasonable suspicion of criminal activity or evidence of a crime, as required by Carty. Defendants further argue that Leach did not voluntarily consent to the search because his consent was coerced by the trooper's threat to call for "a dog."
We agree with defendants that Carty applies in the circumstances presented. We agree with the State, however, that the troopers had reasonable suspicion to justify the request for Leach's consent to search the disabled vehicle that was under his control, and that under all the circumstances, his consent was voluntary. We therefore reverse the order excluding evidence seized from the disabled vehicle, as well as evidence subsequently seized from the individual defendants.

I
These are the facts adduced at the suppression hearing, where two state troopers were the only witnesses, but where the troopers' videotaped encounter was shown.[3]
As Trooper Sean O'Connor readily admitted, and as the judge found, events in this highway incident moved swiftly from a public-safety, caretaking action to investigatory questioning. Trooper O'Connor and Sergeant Ronald Klem were patrolling the Turnpike together when they saw a disabled vehicle and a second car on the right shoulder of the inner roadway (the *1041 car lanes) of the southbound Turnpike, at mile marker 86.5. The troopers were driving on the outer southbound roadway and did not stop because they were "pacing" a speeding vehicle.[4] When they drove by on the inner roadway at 2:50 a.m., and saw the same two cars on the shoulder, they activated their overhead lights and pulled over behind the disabled vehicle. The video camera on the troopers' marked car was automatically activated when the flashing lights were activated.[5] Trooper O'Connor carried the only microphone in his pocket.
The troopers called in to their dispatcher a description of the vehicles, a Lincoln and a Honda, the number of persons involved, and the plate numbers. Trooper O'Connor testified that as they pulled over behind the disabled Lincoln, he saw two men under the vehicle, later identified as defendants Anthony Graham and Marcellius Love, and two women sitting on the guardrail, later identified as defendants Elders and Tasha Jones. A second car, a Honda, was parked in front of the Lincoln on the shoulder, and two individuals, later identified as Leach and Stanley, were seated in that car.
Trooper O'Connor approached the disabled car and offered assistance to the men working on it. He described their reaction: "They were nervous. It appeared that they didn't want any more or further assistance from us." He climbed under the car with them. They told him that the gas tank had fallen down. The only thing the men asked for was a "ratchet," which the troopers did not carry with them. Trooper O'Connor's inspection, after getting out from under the car, revealed that "the fuel filler assembly ... was ... disconnected and hanging free within the gas door."
Sergeant Klem also described the demeanor of the men working on that car: "To me they seemed veryinitially when we first pulled up one of the males scurried out from underneath the vehicle and kind of gave us the "A Okay" sign like things were okay." Trooper O'Connor made some inquiries of Elders, one of the two women sitting on the guardrail. She told him that both cars belonged to Leach, one of the men in the Honda. A computer check revealed that both cars were registered to someone not present at the scene, but neither had been reported stolen. The trooper asked the two women to remain on the guardrail for their own safety. He told Graham and Love to come out from under the car "[f]or their own safety" and "to maintain some sort of control at the scene."
Trooper O'Connor approached the Honda and asked Leach and Stanley to get out, because
[t]he scene was very spread out. We asked them out initially not only to question them but to get more control over the scene. We were obviously at that point beginning to develop a reasonable suspicion there was some criminal activity going on and we wanted them out and contained within the scene for our own safety.[[6]]
Leach confirmed that he was in control of both cars. There is no evidence that *1042 the driver of either car did not produce a valid license. According to the trooper, Leach said "`You can search the cars if you want.' He offered to let us do that." The motion, however, was argued and decided on the basis of Leach's written consent.
In brief questions addressed separately to Elders, Graham, and Leach, the troopers were told that the six had spent the weekend in New York City together, but they were also told three conflicting stories about where they had been: Manhattan, Brooklyn, or the Bronx. Leach said that he had been in the Bronx for a couple of days, where he had been buying clothes; Graham said they were all cousins, he was coming from New York, and spent time visiting family in Manhattan; Elders said that they were coming from Brooklyn, where they had been for two days. Although Graham said they were all cousins, he only knew their "street names." The troopers became suspicious, and called for backup because they were outnumbered. Two other troopers arrived at 3:08 a.m.
In response to cross-examination, Trooper O'Connor explained his raised voice at one point on the tape.
Q Who were you speaking to, trooper?
A At that point one of the individuals, and I can't remember who, got up off the guardrail and somebody had to take control of the situation and it wasn't going to be them so I had to put them in their place.
Q You had to put them in their place?
A Yes. I needed to raise my voice in order to command my point. I'm outnumbered. They know who I am. I don't know them. I don't know who I'm dealing with. I had to raise my voice to keep in a position where we're all safe.
Q So at 3:06 A.M. all these people for all intents and purposes were being detained?
A Their car was disabled
Q I'm asking you, they were being detained?
THE COURT: Let the officer finish the answer and you have another question follow up. One question at a time.
A Their vehicle is disabled. Again, I'm asking them questions. They're free to go if I don't have enough suspicion to keep them there.
Q They were free to go but you had to control them by making them sit on the guardrail and not letting them move?
A Ma'am, in that situation
Q I'm asking you yes or no?
A My safety comes first and I'm not going to let somebody get behind me, no, I'm not.
Q They were either suspects or they were free to go. Which is it?
A I was conducting an investigation at that point.
Q It's your testimony now at 3:06 A.M. they were all free to go?
A No, that's not my testimony. I was conducting an investigation.
Q You just said they were free to go?
A I said if I didn't have enough to hold them they would have been free to go, you're correct, but I felt I had a reasonable and articulable suspicion some type of criminal activity was going on and I had to continue my investigation, you're correct.
Q So they were not free to go?
A At that point yes, that's correct.
Trooper O'Connor sought Sergeant Klem's approval to request Leach to consent to a search "[b]ased on the conflicting statements by the occupants and their nervous demeanor." According to Trooper O'Connor, after getting the sergeant's approval, *1043 he asked and again obtained Leach's oral consent to search the Lincoln.
Q Did Leach give you consent to search the vehicle?
A Yes.
Q Was that first given orally?
A Yes.
Q Once he gave you oral consent what did you do?
A I then brought him back to my troop car where I was going to fill out the consent to search form and have him sign it.
Q Can you describe for us the procedures that you follow in executing a consent to search form?
A In New Jersey State Police we only ask consent to search after having a reasonable and articulable suspicion why we're going to do so. I would then read the subjects the consent to search form and tell them that they do have the right to refuse or withdraw their consent. It's all in the form. After we read them the form then they're asked to sign it.
Q Did you review the consent to search form with Leach?
A Yes, I did.
Q Did you read it to him?
A Yes, I did.
Q Where was Sergeant Klem while you were reading the form?
A Seated next to Leach in the driver's seat of the troop car.
Q Was Christopher Leach buckled in the seat?
A No.
Q Restrained in any way?
A No.
Q Did he indicate that he understood the form?
A Yes, he did.
Q If you know or if you recall, how old was Christopher Leach on September 17, 2004?
A Thirty-two.
Q And did he appear intoxicated?
A No.
Q Did he seem mentally impaired in any way?
A No.
Leach was seated in the front passenger seat of the troopers' car. Sergeant Klem sat in the driver's seat, and Trooper O'Connor stood outside the open front door on the passenger side. Leach was not restrained, although Trooper O'Connor admitted that he was not free to leave. O'Connor read the consent form to Leach, which included the advice that he had the right to refuse consent or to withdraw his consent at any time.
The trooper had repositioned the video camera to focus on Leach, and the trooper's testimony is consistent with the videotape at that point:[7]
Q What did Leach say when you asked him to sign the form?
A He said, "you can search my car but I don't sign."
Q Did you tell him that he did not need to sign the form?
A Yes, I did.
Q What happened once Leach said "you can search but I don't sign"?
A I said "that's fine. You don't have to sign. We'll just call for a dog."
Q Were you planning on calling for the dogs if the consent to search form wasn't executed?
A Yes.
Q Why?

*1044 A I had a reasonable and articulable suspicion there was some type of criminal activity going on and that was the next step.
Q Could the Lincoln Town car be moved at any time?
A No. The Lincoln car was disabled.
Q Did Christopher Leach in fact sign the form?
A Yes, He did.
Q I'm going to show you what's been marked S-2. Can you identify that for us?
A New Jersey State Police consent to search form. Photocopy of the form that was filled out that night.
Q Who signed that form?
A Christopher Leach.
Q Can you tell us the date and time?
A It was September 17, 2004, 3:36 in the morning.
Q Trooper O'Connor, did you search the Lincoln?
A Yes, I did.
Q And what area did you search first?
A I began with the trunk.
Q Okay. And once you had searched the back of the trunk what, if anything, did you do?
A I then allowed one of the occupants to continue work on the car so if the search turned up with a negative result they could get on their way a little more quickly.
Thirty minutes had elapsed from the time the troopers stopped at the scene to the time Leach signed the consent form.[8] A search of the trunk and passenger compartment of the Lincoln revealed nothing. Under the hood, however, the trooper found a bundle wrapped in black tape, attached to the air filter assembly in the engine compartment. The troopers suspected that the contents of the bundle was a controlled dangerous substance. At that point, the troopers placed all six defendants under arrest. All were searched incident to arrest.

II
We reject the State's contention that Carty does not apply in these circumstances, that is, where law enforcement officers did not initiate a stop, but initially approached an apparently disabled vehicle out of appropriate concern for public safety and in fulfillment of their community care-taking responsibility. In Carty, the Supreme Court held:
We hold that, in order for a consent to search a motor vehicle and its occupants to be valid, law enforcement personnel must have a reasonable and articulable suspicion of criminal wrongdoing prior to seeking consent to search a lawfully stopped motor vehicle. The reasonable and articulable suspicion standard is derived from the New Jersey Constitution and serves the prophylactic purpose of preventing the police from turning routine traffic stops into a fishing expedition for criminal activity unrelated to the lawful stop.
[170 N.J. at 635, 790 A.2d 903].
Writing for the Court in Carty, Justice Coleman began by recalling the Court's prior decision in State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975), adopting a stricter standard for consent searches in New Jersey than the standard prescribed under the United States Constitution by the United States Supreme Court in Schneckloth v. Bustamonte, 412 U.S. 218, 248-49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875. Carty, supra, 170 N.J. at 639, 790 A.2d 903.
*1045 In Johnson, the Court held that a valid consent search must be not only voluntary, but also knowing; that is, the individual must be informed of his right to refuse consent and his right to withdraw consent. 68 N.J. at 354, 346 A.2d 66. In Carty, the Court further refined the standard:
What can be synthesized from a review of scholarly articles, cases from around the country, and the empirical data referred to in this opinion, is that despite use of the first-tell-then-ask rule or the voluntary and knowing standard adopted in Johnson, consent searches following valid motor vehicle stops are either not voluntary because people feel compelled to consent for various reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search. Stated differently, hindsight has taught us that the Johnson standard has not been effective in protecting our citizens' interest against unreasonable intrusions when it comes to suspicionless consent searches following valid motor vehicle stops. We therefore must consider an appropriate modification of the Johnson standard.
[Carty, supra, 170 N.J. at 645-46, 790 A.2d 903].
We see no reason to read Carty as narrowly as the State suggests: that objectively reasonable suspicion is only a prerequisite to a request for consent to search when a vehicle has been stopped by police, but not when the driver has stopped for other reasons. The potential for unwarranted police intrusion upon private citizens traveling our highwaysthe evil that Carty sought to addressexists in either situation. We view the suggested distinction as one that makes no legal difference.

III
We are satisfied that consistent with Carty, the totality of the circumstances in this case justified the troopers' suspicion that criminal activity was afoot, and therefore justified Trooper O'Connor in requesting Leach's consent to search the disabled Lincoln.

A
Even where police have stopped a motor vehicle on the highwayhere, of course, defendants themselves had stopped to make repairswe have held that "the police may question the occupants, even on a subject unrelated to the purpose of the stop, without violating the Fourth Amendment, so long as such questioning does not [unreasonably] extend the duration of the stop." State v. Hickman, 335 N.J.Super. 623, 636, 763 A.2d 330 (App.Div.2000); see also State v. Pegeese, 351 N.J.Super. 25, 30-32, 796 A.2d 934 (App.Div.2002).
There is no bright-line rule for the permissible length of an investigatory detention; all of the surrounding circumstances are relevant factors. See State v. Dickey, 152 N.J. 468, 476-77, 481-82, 706 A.2d 180 (1998). The scope of the intrusion, such as whether the individual is handcuffed, subjected to fear or humiliation, placed in a police car, removed to police headquarters, or isolated from others, as well as whether the delay exceeded the necessities of legitimate investigation, are all important factors. Id. at 478-79, 706 A.2d 180. In Dickey, we held that the defendant's detention was overly intrusive and constituted a de facto arrest that required probable cause, not merely reasonable suspicion. The defendant, a passenger in a car that was stopped by a state trooper, was transported to the State Police barracks and effectively confined there; he ultimately consented to a search more than four hours after the traffic stop. Id. at 472-74, 485, 706 A.2d 180. Unlike the circumstances in Dickey, there is no evidence here, especially in light of the *1046 disabled vehicle and the close proximity of all six defendants, that the troopers' continued investigation was overly intrusive or detained defendants unreasonably.
Defendants were stopped on the shoulder of a limited access highway as a result of the breakdown of one of their own cars. When the troopers initially stopped to investigate, defendants had already been parked along the side of the highway for some period of time. The delay caused by the troopers' investigation lasted barely thirty minutes, from the troopers' stop at 2:50 a.m. until Leach signed the consent form at 3:17 a.m. After finding nothing in the Lincoln's trunk, the troopers allowed Love and Graham to continue work on the Lincoln at 3:47 a.m., so that if the full search revealed no contraband, they could continue on their way. At that point, almost an hour had elapsed, obviously not an insignificant period on its face. But whether it was unreasonable under the circumstances, or whether waiting for a dog would have unreasonably lengthened the detention, are questions we consider in light of defendant's need to repair the Lincoln, and the fact that all defendants had chosen to remain with the disabled vehicle, despite the availability of the operable Honda. We cannot know how long either one would have takenthe repair or the dogbecause the search and ensuing discovery cut short the repair and avoided any wait for a dog. All we do know is that the repair work had been unsuccessful for some period of time before the troopers stopped, and despite having another operable vehicle, defendants had chosen to remain on the shoulder of the highway.[9]
In order to justify a detention, the officer "`must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" State v. Arthur, 149 N.J. 1, 8, 691 A.2d 808 (1997) (alteration in original) (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). There must be "`some minimum level of objective justification for making the stop.'" State v. Nishina, 175 N.J. 502, 511, 816 A.2d 153 (2003) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989)). We will address the troopers' objective justification for continuing their investigation in this case, that is, the reasonableness of the troopers' suspicion.

B
"`Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" State v. Stovall, 170 N.J. 346, 370, 788 A.2d 746 (2002) (quoting United States v. Valentine, 232 F.3d 350, 353 (3d Cir.2000), cert. denied, 532 U.S. 1014, 121 S.Ct. 1748, 149 L.Ed.2d 670 (2001)). In Stovall, the Court reversed our decision affirming an order suppressing drug evidence that was found in the defendant's suitcase after suspicious circumstances led airport police to detain the defendant and a drug-sniffing dog reacted to the suitcase. Id. at 351-55, 788 A.2d 746. The Court discussed at length the concept of "reasonable suspicion," emphasizing that there is no simple definition, that it is "`the totality of the circumstances'" that must be considered, id. at 361, 788 A.2d 746 (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)), and that "[c]ommon sense ... guides our analysis." *1047 Stovall, supra, 170 N.J. at 370, 788 A.2d 746.
Writing for the Court, Justice Zazzali explicitly recognized that in looking at the totality of the circumstances, a police officer's own experience may be considered, id. at 363, 788 A.2d 746, that "a suspect's nervousness plays a role in determining whether reasonable suspicion exists," id. at 367, 788 A.2d 746, and "police may rely on characteristics consistent with both innocence and guilt in formulating reasonable suspicion." Id. at 369, 788 A.2d 746. Here, however, the judge speculated that "being nervous and giving conflicting statements could involve many, many reasons" and disregarded those factors as grounds for "articulable suspicion."
There is no easy formula by which to measure "reasonable and articulable suspicion," Stovall, supra, 170 N.J. at 361, 788 A.2d 746, and the determination requires a highly fact-sensitive analysis. Nishina, supra, 175 N.J. at 511, 816 A.2d 153. "Facts that might seem innocent when viewed in isolation can sustain a finding of reasonable suspicion when considered in the aggregate, so long as the officer maintains an objectively reasonable belief that the collective circumstances are consistent with criminal conduct." Ibid.
The motion judge correctly recognized that the issue was whether or not there were objectively reasonable grounds for the troopers' conduct. As he said, it was "not about the subjective intent of the officers. It's about whether their conduct was objectively reasonable ...."
Sergeant Klem, who was the patrol supervisor riding with Trooper O'Connor (and the substantially more experienced officer on the scene), described the circumstances that first aroused his own suspicion that something was not right. First, when the troopers first stopped behind the disabled car, one of the men under the car came out and gave the troopers an "okay" sign. The trunk was open, as was the gas tank door. Sergeant Klem described his reaction when he looked into the open gas tank door:
[W]ith my training, I come across and I have come across many different vehicles where things are hidden in different compartments, most likely drugs. The fact that the gas tank was not secured, I have never seen that before and I just felt that it was not right. Something wasn't right there.
The Sergeant answered questions from the judge about the suspicion the gas tank raised in his mind. He explained that while he had never found drugs in a gas tank filler door assembly, he had conducted motor vehicle searches on account of finding a "loose part or some part of a vehicle that had been apparently manipulated or tampered with," and that raised a suspicion of hidden drugs.
Here, the troopers found a disabled vehicle whose driver and passenger, while trying to effect repairs, appeared nervous at their presence and anxious for them to leave without providing further assistance. The disabled vehicle had a loose gas tank, and the troopers knew from experience that contraband is often hidden in odd places in a motor vehicle. There were six individuals traveling together in two cars, neither of which was owned by any of them. Two individuals, including the person said to be "in charge" of both cars, were sitting in a second car that was parked ahead of the disabled car, having chosen to remain alongside rather than seek help or continue their trip.
Although the six were described as "cousins," heading home to North Carolina, they did not know each other's full names. And although they were supposed to have been together in New York City, the troopers were given three different locations where supposedly they had been. *1048 Just as the Court found in Stovall, we are satisfied, "based on this evidence and the template of common sense, [that the troopers] had more than a `hunch.' [They] had the responsibility not to turn a blind eye to what [they] heard and saw; [they] had the concomitant right to act as [they] did." Id. at 371, 788 A.2d 746.
In finding that the troopers did not have reasonable suspicion to justify a request for consent to search, the motion judge emphasized Trooper O'Connor's testimony that shortly after the troopers pulled over and asked what was happening, Graham and Love appeared "nervous." The judge found that signs of nervousness when confronted with a law enforcement officer do not constitute reasonable suspicion. Nervousness alone is not a reasonable basis for suspecting criminal conduct or the presence of contraband. "Nervousness and furtive gestures may, in conjunction with other objective facts, justify a Terry search, but ordinarily `[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity.'" Carty, supra, 170 N.J. at 648, 790 A.2d 903 (alternation in original) (quoting State v. Lund, 119 N.J. 35, 47, 573 A.2d 1376 (1990)).
The trooper, however, described more than nervousness. What he said was "[t]hey were nervous. It appeared that they didn't want any more or further assistance from us." (Emphasis added). With their car disabled on the shoulder of the New Jersey Turnpike at three o'clock in the morning, and with a gas tank hanging loose from its nest beneath the car, drivers and passengers alike could be expected to show relief at the arrival of the troopers. The troopers could reasonably expect a law-abiding person in these circumstances to ask for help, to secure mechanical assistance or a tow, or, at a minimum, to protect them while they attempted to complete their own repairs. In that context, defendants' contrary reactions take on greater significance than the typical "nervous" reaction of an ordinary motorist who is pulled over by a police officer.
In Carty, the Court found that the officers did not have reasonable suspicion to justify the request for consent to search, and the product of the search therefore was inadmissible. 170 N.J. at 647-48, 790 A.2d 903. But the facts here are distinguishable. The trooper in Carty testified that he sought consent based on the nervous demeanor of the occupants and the defendant's and driver's conflicting stories. But the Court concluded that the stories did not conflict; the defendant's account was simply more detailed than the one provided by the driver. Ibid. Thus "there was nothing more than nervousness to raise the trooper's suspicions." Id. at 648, 790 A.2d 903.

C
When the outcome of a suppression hearing is dependent upon the judge's findings of fact, including witness credibility, we defer to those findings as long as they are supported by sufficient credible evidence in the record. See State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999). Here, however, the outcome is based upon the judge's application of the law to facts that are essentially undisputed. The most telling evidence at the hearing was the videotape of the highway incident, and the only witnesses at the hearing were the two troopers most closely involved in the incident. No material factual dispute or contradiction arose from that evidence, and no special deference to judicial factfinding is warranted. We are satisfied that the troopers had a reasonable, articulable suspicion that there was evidence *1049 of crime in the vehicle they sought to search.

IV
The next question presented by this appeal is whether the troopers' stated intention to call for "a dog," after Leach initially refused to sign the consent form, constituted coercion sufficient to rebut the State's reliance upon Leach's written consent as voluntary. If there was a lawful basis for the troopers to call for a drugsniffing dog, then there was nothing unfairly coercive about Trooper O'Connor informing Leach as to what would happen next: without Leach's consent, the trooper in fact would call for a dog.
The test of a justifiable use of a drug-sniffing dog is reasonable suspicion the same test applicable to justify a request for consent to search. See State v. Cancel, 256 N.J.Super. 430, 435, 607 A.2d 199 (App.Div.1992), certif. denied, 134 N.J. 484, 634 A.2d 530 (1993). In Cancel, we affirmed the denial of a motion to suppress and a conviction of seconddegree possession of marijuana with intent to distribute. Id. at 432-33, 437, 607 A.2d 199. In that case, police officers used a trained dog to sniff all luggage that came from a flight from Arizona. Id. at 433, 607 A.2d 199. We described the officers' experience with illegal drugs brought into New Jersey from that state as "sufficient to satisfy the modest level of reasonable suspicion needed to justify the unintrusive use of dogs to sniff all luggage on such flights for narcotics." Id. at 435, 607 A.2d 199.[10]
After the dog signaled that the defendant's luggage contained narcotics, the officers requested her to consent to their inspecting its contents, "advising her that she could refuse but that if she did they would detain her until they obtained a search warrant." Id. at 433, 607 A.2d 199. We held that the dog's admittedly reliable reaction, combined with a false name on the defendant's luggage, gave police probable cause both to arrest her and to obtain a valid search warrant for the luggage. Ibid. "[T]he officers' comment to defendant that she would be detained while they obtained a search warrant was a fair prediction of events that would follow, not a deceptive threat made to deprive her of the ability to make an informed consent." Id. at 434, 607 A.2d 199. That conclusion is comparable to the situation before us.
The point is that both in Carty and here, law enforcement officers informed a suspect that they would do what they were lawfully entitled to do. In Cancel, police officers were lawfully entitled to obtain a search warrant based on probable cause. Id. at 433-34, 607 A.2d 199. Here, the officers were lawfully entitled to bring in a drug-sniffing dog based on reasonable suspicion.
We are satisfied that the troopers had articulable and reasonable suspicion to justify calling for a dog, just as they were justified in asking for Leach's consent to search the disabled vehicle. Because the trooper had the right to call for a drugsniffing dog, his advice to Leach was "a fair prediction of events that would follow, not a deceptive threat made to deprive [him] of the ability to make an informed consent." Ibid. That Leach changed his mind about signing the consent form and agreed in writing to the search immediately *1050 after facing the likelihood that the troopers would bring a dog, does not make his consent involuntary.

V
Finally, we address the question whether Leach's apparent request for an attorney earlier in the confrontation was a sufficient basis for the judge to conclude that Leach's subsequent consent was not voluntary. We are satisfied that it was not.
The audio portion of the videotape, including the largely inaudible interchange between the troopers and Leach, while they were at or alongside the Honda, satisfied Trooper O'Connor at the hearing that at some point before he requested consent to search the Lincoln, Leach asked, "Can I have a lawyer?" The trooper volunteered that, if he had heard the request, he should not have continued questioning Leach,[11] but he testified that he did not hear such a request at the time. Sergeant Klem also denied hearing Leach ask for a lawyer. The motion judge did not disbelieve the testimony that the troopers did not hear Leach's request.
With respect to Leach's apparent request for counsel, the judge stated the following:
Very shortly after being questioned, apparently Mr. Leach, although it's not so clear to the Court which of the defendants was asking for a lawyer, but Trooper O'Connor concedes that it was Mr. Leach, but more importantly, it appears that all of the defendants were sitting on the guardrail at the time that they were initially being questioned and for sure the Court has heard someone say, "can I have a lawyer?"
Thereafter, the Court also overhears on the videotape that one or both of the troopers becomes somewhat impatient or annoyed, if you will, and begins in a loud voice to yell or to say to whoever is asking for a lawyer that you got a bad attitude and I don't need this bad attitude, so on and so forth.
Thereafter, the action moves to Mr. Leach being asked to sit in a State Police car. Sergeant Klem on one side. Trooper O'Connor on the other side. And Trooper O'Connor begins to read, as [counsel for defendant Love] has pointed out, the right to refuse consent at such a pace that the Court had difficulty understanding it and following it despite the fact that it would appear that Mr. Leach did not have trouble following it too much because he's shaking his head in the negative while it's being explained to him. He there again refuses to sign the consent form. There is a threat that the dogs will come and we will wait for the dogs.
It's interesting to me how all of you in your experience assume we know what kind of dogs we're talking about, but all the trooper said we will wait for the dogs and that's it, and I don't know whether they're talking about bomb sniffing dogs or drug sniffing dogs or any other kind of dog.
In any event, it seems like after some back and forth with Mr. Leach he then agrees to sign the form. This is after some cajoling from Trooper O'Connor about him not wanting to take the weight for the other guys. It is after clearly Trooper O'Connor did not really slowly read the form to him and explain it to him.
I think in the totality of circumstances, the fact that we're in this limited *1051 access, the fact Mr. Leach is now surrounded by some officers, the fact all these defendants have already been detained for a substantial period of time, probably like a half an hour by that time or a little longer, the fact that Mr. Leach or someone else has already asked for a lawyer and that request has either been not heard or ignored, and I, unlike some of you counsel, I'm not so satisfied that necessarily suggests the officers are not telling the truth because I would suggest to you that when you're out there at three o'clock in the morning on the New Jersey Turnpike, trailer trucks are going by at 75 miles an hour, it is quite possible in the excitement of a moment that somebody might not hear such a statement, but whether they heard it or not is not the point.
The point is what does it say about Mr. Leach's intent to freely and voluntarily and knowingly consent, and I say it suggests as one factor he did not intend freely and voluntarily to consent.
[Emphasis added.]
We recognize our obligation to give deference to the findings of the Law Division judge, as long as those findings are based upon sufficient credible evidence in the record. See Locurto, supra, 157 N.J. at 474, 724 A.2d 234. But the rationale for according the trial judge's finding such deference is that those findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." Ibid.
Here, however, the observations upon which the motion judge explicitly made his findings and drew his conclusions came from the videotaped encounter, and that videotape is equally available to us.
Our own observations do not support the findings cited by the judge to conclude that Leach did not voluntarily consent to the search. First, Leach's question whether he could have a lawyer apparently occurred earlier in the recorded encounter, well before Leach was asked to consent to a search. It is undisputed that before Leach heard that Trooper O'Connor would call for a dog, he refused to sign the consent form, whereas after that advice, he agreed and did sign the form. The issue before the motion judge was whether Leach's conduct was voluntary when he actually signed his consent to a search.
Second, the judge's description of how quickly Trooper O'Connor read the consent form to Leach does not accord with our observations. The trooper's reading is easily heard and understood. The State's burden to prove knowing and voluntary consent requires proof that defendant knew he had a choice, and made that choice without coercion. It does not require proof that Leach was happy with the choices he faced.
Third, the judge cited the trooper's "threat" to call for "a dog." We explained above why the trooper's explanation, which we saw and heard on the tape, and which was calmly and quietly given, was not coercive so as to affect the voluntariness of consent.[12]
Fourth, the judge cited angry remarks by a trooper, accusing someone of having a "bad attitude," and ascribing those remarks to a request for a lawyer.[13] *1052 We perceive no relationship between angry remarks, earlier in the encounter, and Leach's decision later to consent to a search.
Fifth, the judge described Trooper O'Connor "cajoling" Leach by indicating his respect for Leach not wanting to "take the weight" for anyone else. We do not understand that the Trooper's comments, which are readily apparent on the videotape, were in any sense "cajoling" Leach to sign the consent form or affected his voluntary choice.
Reversed and remanded for further proceedings consistent herewith.
NOTES
[1] The State filed separate Notices of Appeal respecting each defendant. However, the briefs submitted by the State are identical in each appeal and each of the defendant's briefs is also identical. No separate issues are raised in any of the appeals, and we have consolidated all six appeals in this opinion.
[2] At the hearing, the judge referred to counsel for Stanley as the "movant" on the motion, and to "other counsel either informally or formally joining in."
[3] After the testimony of the two state troopers who conducted the roadside investigation, the judge rejected defense counsel's request to obtain "racial profiling" discovery respecting those troopers. Defendants have not cross-appealed.
[4] We do not know whether Troopers O'Connor and Klem called in to report the disabled vehicle when they first sighted it, nor does the record reflect what time that was.
[5] Before the troopers testified, the entire videotape was played at the start of the suppression hearing, but the audio portion was not transcribed.
[6] Because the camera in the troopers' car was still trained on the Lincoln and the guardrail alongside, the Honda is not readily visible on the videotape, and the audio recording hardly picked up any of the troopers' exchanges with Leach or Stanley while they were alongside the Honda.
[7] The trooper's earlier exchanges with Leach, before they came back to sit in the trooper's car, are not audible to us on the recording.
[8] The videotape displays "real time."
[9] We make no attempt to create a hard-and-fast rule defining the reasonable length of a highway detention to investigate suspicious circumstances or to await a drug-sniffing dog. Future cases are likely to present other facts and circumstances to be considered in light of the general principles we have applied here.
[10] In Cancel, we also rejected the argument that "routine use of a trained dog to sniff luggage in a public passenger terminal is itself an unlawful search." Id. at 435, 607 A.2d 199. We quoted the United States Supreme Court decision in United States v. Place, 462 U.S. 696, 706-07, 103 S.Ct. 2637, 2644-45, 77 L.Ed.2d 110, 120-21 (1983), to explain "why warrantless police use of narcotics-sniffing dogs is permitted under [both] the Fourth Amendment of the United States Constitution... [and] under article I, paragraph 7 of the New Jersey Constitution." Cancel, supra, 256 N.J.Super. at 436, 607 A.2d 199.
[11] Defendants do not argue that defendant's request affected the trooper's right to request consent to search the Lincoln, and we need not address the question. The judge considered that request only as evidence that Leach's later consent was not subjectively voluntary.
[12] A positive response from a trained dog would have given the troopers probable cause to obtain a warrant, and defendants would have faced further lawful detention. It is entirely plausible that when confronted with the choice, defendant made a calculated but voluntary decision to consent.
[13] It is not clear from the judge's comments or the videotape whether more than one of the defendants ever asked if he or she could have a lawyer.