923 A.2d 276 (2007)
393 N.J. Super. 275
STATE of New Jersey, Plaintiff-Appellant,
v.
Angela BAUM and Jermel Moore, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 25, 2007.
Decided May 30, 2007.
*278 Eric Mark, Assistant Prosecutor, argued the cause for appellant (Wayne J. Forrest, Somerset County Prosecutor, attorney; Mr. Mark, on the brief).
Shara Saget, Assistant Deputy Public Defender, argued the cause for respondent Moore (Yvonne Smith Segars, Public Defender, attorney; Jodi L. Ferguson, Assistant Deputy Public Defender, of counsel and on the brief).
Tombadore & Wilson, attorneys for respondent Baum (Robert G. Nilson, on the letter relying on the brief filed on behalf of respondent Moore).
*279 Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
LEFELT, P.J.A.D.
The trial court suppressed marijuana and cocaine seized in the course of a traffic stop for driving a vehicle with dark tinted windows and without an inspection sticker. Although the parties agree that the initial stop was lawful, the trial court suppressed the evidence because it determined that the arresting officer violated defendants', Angela Baum's and Jermel Moore's, constitutional rights by expanding the detention and interrogation beyond the reason for the traffic stop without reasonable suspicion, and by failing to provide Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings. We granted the State's interlocutory appeal and now reverse and remand.
Here is what happened.[1] At about 11:45 p.m. on June 5, Officer Reese of the Bernards Township Police Department observed an unoccupied red Toyota with tinted windows parked at a gas pump of an Exxon station. The vehicle had a New Jersey license plate but no inspection sticker. A computer check revealed the vehicle had not been reported stolen, but the registered owner's license was suspended.
Reese observed the vehicle leave the station and stopped it as the vehicle entered the ramp to Interstate 78, which is a known drug courier route. Before exiting his patrol car, Reese radioed the license plate number of the stopped vehicle and his location to the dispatcher. As Reese approached the vehicle, he noticed there were four occupants, Baum in the driver's seat, Moore in the passenger seat, and Moore's young daughter and the girl's mother in the back seat.
Reese asked Baum for her driver's license and proof of registration and insurance. Baum indicated she did not have her license or an insurance card with her, and that the vehicle did not belong to her. She did, however, give Reese the vehicle's registration card. The car was not registered in either Baum's or Moore's names. Reese told her to step out of the car and wait in front of his patrol car.
While Baum, a pregnant young mother of two, waited for Reese, the officer asked Moore who owned the car. Moore replied that the car belonged to a friend of his father, but he did not know the friend's name. When questioned regarding how he got the car, where he was going, where he had been, and what his business was there, Moore told Reese that the group had taken the bus from Pennsylvania to New York City and had picked up the Toyota there. According to Moore, they had traveled to New York to pick up his daughter.
Reese then walked back toward his patrol car to speak with Baum who was standing at the car's front bumper with her arms crossed, hugging her torso, as if cold. When he asked her why she did not have any identification, she replied that she had left it at home because she left in a hurry that day. In response to Reese's further questions regarding the group's activities that day, Baum reported, contrary to Moore's story, that Moore and the other occupants had picked her up in the car in Pennsylvania and they had all driven to New York to pick up "their daughter's stuff." Baum stated that she had to *280 return home soon because she promised to babysit for her sister.
Baum began to shiver, and Reese, who was wearing a short sleeve uniform shirt, commented that it was not "that cold out." According to the officer, the temperature was approximately 60 degrees. Baum, who was wearing a sweatshirt, replied that she was always cold.
Reese then questioned her further about who owned the car, where she worked and lived and how she knew the other vehicle occupants. She responded that she "was under the impression" Moore owned the car, she worked as a waitress, and had known the others since she discovered she was pregnant three months earlier. Reese then asked if the father of her child was in the car; Baum responded "no," and then repeated her version of the day's events.
Reese called for a second patrol car and then asked Baum if she knew why she had been stopped. She indicated she did not. The officer informed Baum she was stopped because there was no inspection sticker. Baum replied that she thought the car had a pink card from the motor vehicle agency that meant an inspection was not necessary.
Reese then returned to the stopped vehicle, verified that the vehicle was uninspected, and obtained Moore's identification. He then asked Baum why she did not have her license. She replied that she never carries it because she rarely drives. Reese then asked for Baum's name, address, and date of birth so he could check on the status of her driver's license.
The officer testified that "other traffic on the air" precluded his radioing headquarters, and he did not request the check on her license status until four minutes later. In addition, during this period Reese became involved as a supervisor on another stop of a suspicious vehicle that was simultaneously occurring at the other end of town. While waiting for dispatch to respond with the information, the officer continued to explore aspects of Baum's story, by asking her "[i]s that the end of the story . . . your stories don't match . . . [a]re you sure there's nothing else going on?" To which Baum replied "no, that's the truth." Reese expressed disbelief at Baum's story, commenting that it "took an awful lot of time to pick up clothes." A second officer had by this time arrived on the scene and was standing silently near Baum, watching her with his hand on his hip and holstered gun.
While Reese waited for dispatch to verify the status of Baum's driver's license, he continued questioning both Baum and Moore about their personal information and day's travels.
Finally, Reese told Baum, "I'm a little suspicious about your trip. I'd prefer if you just cooperate and tell me what's going on . . . Your stories don't add up . . . . Something's going on here . . . there's more going on than you're telling me."
The following exchange then occurred:
Reese: I'm going to tell you what I think . . . there's something in that car that shouldn't be there. You're not disagreeing with me, so I know you know what I'm talking about. You're driving the car, not in any trouble. Right now I just have you not having a license driving an uninspected car. But, if you want to take this opportunity to tell me what's going on here, why your stories don't match, its not a coincidence I have this vision in my head, I do this for a living. You want to tell me what's going on?
Baum: I admit, yes, they were smoking weed and whether he came back with any, I don't know.
Reese: Uh-huh.

*281 Baum: Me and her, we were ready to leave, but he kept prolonging it and prolonging it.
Reese: Am I going to have to get a drug dog out here and solve this problem? I'd rather not scare the living daylights out of the kid or anything like that.
Baum: Well, I'm scared now. I don't want to be stuck in New Jersey.
Reese: Well, we're going to get to the bottom of it, okay? You're in control of the car, so we'll see where things go with your license and we'll talk about what we are going to do . . . I think you know more than what you're telling me.
Baum: I'm not going to stand here and lie. I'm getting my life back together. Yes, there is weed in the car. Where it is, I don't know where he put it.
Reese: How much is there.
Baum (crying): I couldn't even tell you.
Reese: Are you going to cooperate with me?
Baum: I'm not trying to go to jail. I got my third baby on the way. I've been doing good.
Reese: You know there's weed in the car and I'm suspecting you probably know that's why he's traveling out there. . . how much did he tell you he was getting?
Baum: He didn't.
Reese: How much did he tell you he was going to spend?
Baum: Like $175.
Reese: Well, do you think it's on him, or do you think he hid it somewhere?
Baum: Somewhere in the car.
Reese: Front seat or back seat?
Baum: Could be underneath, I don't know. When we're in New York I know he has it in different places.
Shortly thereafter, dispatch reported that Baum's license was suspended. Reese then arrested her and at that point administered Miranda warnings. Baum waived her rights and, still crying, told Reese that the drugs were "in the back somewhere" in a Scotchguard can with a false bottom. When asked if any guns were in the car, Baum reported that she knew Moore carried a gun in the past but did not think there were any guns in the car. The second officer handcuffed Baum and placed her in the patrol car.
After the officers secured Moore, the vehicle was searched and marijuana and cocaine were found inside the Scotchguard can described by Baum. Reese then administered Miranda warnings to Moore, who admitted that the cocaine was his, but that the marijuana was Baum's.
Based on these facts, the trial court granted the defendants' motion to suppress the seized evidence. The judge acknowledged that the initial stop was lawful and that although the response from dispatch to Reese's inquiry regarding Baum's driver's license may have been legitimately delayed by other police activity, Reese was accusatory, causing Baum to cry, and that his threat to bring the narcotics dog to the scene was coercive because there was a child in the back seat.
The judge noted that Reese himself admitted that he "didn't know if [he] was going to explore a burglary, contraband. . . a dead body in the trunk."
[H]e sought to get into that vehicle and conduct a search through a means of harassing, being overbearing, being accusatory, and certainly not conversational with not only Miss Baum but also Mr. Moore to the extent that she was browbeaten.
Once he engaged in that sort of conduct, he had already formulated in his mind, once he got her to admit and utter the words, "we were smoking earlier", he *282 decided he was going to search the car and accelerated the method and manner in which he handled Miss Baum . . . it was custodial at that point. He should have given them Miranda warnings.
The judge found that Baum's admission of smoking weed did not provide probable cause to search the car because
the words of Miss Baum at that point were not we smoked marijuana in the car or we used weed in the car, we used drugs in the car; it was we were smoking weed earlier. As a matter of fact, my recollection of the testimony is that she said she didn't know if they brought any back. It's only after his coercive conduct that she then says there's weed in the car, and he, meaning Moore, knows where it is.
The judge noted that although there was merit to the explanation offered by Reese that "dispatch was tied up", Reese separated Baum from the others and "subjected her to fear and humiliation":
And I don't find that as a result of his detention he elicited specific articulable facts which, taken together with rational inferences, that would warrant the intrusion.. . . There needs to be a minimum level of objective justification.
The judge further found that the fact that Reese did not try to elicit further information regarding vehicle ownership or Baum's licensure, the "predicate for him to make the stop", supported a holding that the stop was pretextual.
We are of course bound by the trial judge's credibility findings. State v. Locurto, 157 N.J. 463, 470, 724 A.2d 234 (1999). However, we are not bound by the trial court's "interpretation of the law and the legal consequences that flow from established facts," Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995), and it is here where we part company with the trial court.[2]
"Temporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons'" within the meaning of the Fourth Amendment. State v. Dickey, 152 N.J. 468, 475, 706 A.2d 180 (1998) (quoting Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996)). "Therefore, any automobile stop, however brief, must satisfy the Fourth Amendment's basic requirement of `reasonableness.'" State v. Hickman, 335 N.J.Super. 623, 634, 763 A.2d 330 (App.Div.2000) (citing Dickey, supra, 152 N.J. at 475, 706 A.2d 180).
In terms of a stop, this requirement may be met by showing that "the police [had] probable cause to believe that a traffic violation had occurred." Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979); Dickey, supra, 152 N.J. at 475, 706 A.2d 180. In this case, no one questions the legitimacy of Officer Reese's initial traffic stop of the Toyota. See State v. Carty, 170 N.J. 632, 639-40, 790 A.2d 903, modified on other grounds, 174 N.J. 351, 806 A.2d 798 (2002); Dickey, supra, 152 N.J. at 475, 706 A.2d 180.
*283 When the officer's stop is justified at its inception, the question becomes whether the ensuing investigation is "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). At a traffic stop, an officer may seek a driver's license, as well as proof of ownership and insurance. United States v. Ramos, 42 F.3d 1160, 1163 (8th. Cir. 1994), cert. denied, 514 U.S. 1134, 115 S.Ct. 2015, 131 L.Ed.2d 1013 (1995). The officer may also ask "routine" questions of the vehicle's occupants, such as where they are going and coming from, and for what purpose. Ibid. When Officer Reese so investigated, he discovered that Baum, the driver, did not have a driver's license with her and that none of the occupants of the car could provide the name of the car's owner. When further questioned, Baum and Moore advanced conflicting versions of their travels, with Baum nervously asserting that she had traveled by bus from Pennsylvania to New York and Moore insisting that the pair had driven in the Toyota.
The inconsistent stories, inability to name the owner of the car, the lack of a driver's license, and Baum's nervousness supported a reasonable extension of the original detention beyond the activity justifying the initial stop. See Dickey, supra, 152 N.J. at 479-80, 706 A.2d 180; Hickman, supra, 335 N.J.Super. at 637-38, 763 A.2d 330. These circumstances would raise in an investigating officer's mind reasonable concern regarding whether the vehicle was being used for some illegal purpose. If during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances "give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions." Dickey, supra, 152 N.J. at 479-80, 706 A.2d 180 (citing United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir.), cert. denied, 516 U.S. 936, 116 S.Ct. 348, 133 L.Ed.2d 245 (1995) (quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir.1993))).
During this broadened inquiry, the questioning may be accusatory and designed to elicit incriminating responses, Hickman, supra, 335 N.J.Super. at 631, 763 A.2d 330, however, the officers must pursue a means of investigation that is "likely to confirm or dispel their suspicions quickly." Dickey, supra, 152 N.J. at 476, 706 A.2d 180 (citing United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615-16 (1985)); see also State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986) (framing this inquiry as "whether the officer used the least intrusive investigative techniques reasonably available to verify or dispel his suspicion in the shortest period of time reasonably possible.").
But, "[e]ven a stop that lasts no longer than necessary to complete the investigation . . . may amount to an illegal arrest if the stop is more than `minimally intrusive.'" Dickey, supra, 152 N.J. at 478, 706 A.2d 180. Thus, a justified investigative detention escalates into custodial arrest when the officers' conduct is more intrusive than necessary for an investigative stop, regardless of the duration of the stop. Ibid. Factors to be weighed in determining whether such escalation occurred is whether there was delay unnecessary to the legitimate investigation, the degree to which the police conduct engenders fear or humiliation, and whether the suspect was isolated, handcuffed, or confined. Id. at 479, 706 A.2d 180 (citing United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir.1994), cert. denied, 514 U.S. 1113, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995)).
There is no "hard-and-fast rule defining the reasonable length of a highway *284 detention to investigate suspicious circumstances." State v. Elders, 386 N.J.Super. 208, 224 n. 9, 899 A.2d 1037 (App.Div. 2006). Rather, common sense and ordinary human experience must govern over rigid criteria. State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986). Federal decisions have upheld detentions of forty-five, fifty, sixty and even seventy-five minutes where, for example, the delay was "necessitated by efforts to obtain a narcotics dog." See Dickey, supra, 152 N.J. at 481, 706 A.2d 180. "In Sharpe, supra, the Court found that a twenty-minute detention was reasonable when the police acted diligently and defendant contributed to the delay." Ibid. (citing 470 U.S. at 686-88, 105 S.Ct. at 1575-77, 84 L.Ed.2d at 615-17).
In this case, the detention from the stop until the first arrest spanned some twenty-six minutes. The radio traffic caused some of the delay, as acknowledged by the trial court, but the bulk of the delay was caused because defendants advanced blatantly conflicting stories regarding their trip to New York, and the constitution does not require police officers to ignore the suspicion engendered by these conflicts, provided the detention is not unduly extended. Davis, supra, 104 N.J. at 505, 517 A.2d 859; Hickman, supra, 335 N.J.Super. at 636-38, 763 A.2d 330. We note that it took only ten minutes of detention for those conflicts to be apparent.
Yet, even brief detentions can be unreasonable if they do not use "the least intrusive investigative techniques reasonably available to verify or dispel suspicion in the shortest period of time reasonably possible." Davis, supra, 104 N.J. at 504, 517 A.2d 859. Although Baum was separated from the others, she was not humiliated or handcuffed and the only investigative technique utilized by Officer Reese was to question the passengers and Baum separately, alternating between the two. Throughout the questioning, the officer remained polite and never yelled at Baum. As for Moore, during the entire investigation, Officer Reese questioned him while he sat in the passenger seat of the Toyota. Moore was allowed to remain with the other passengers and was not separated from them until his arrest.
Furthermore, drug activity was not the only illegality that could have been investigated. As the officer explained, while he initially explored a possible drug connection, he would have explored other possibilities of illegal conduct, had it become necessary.
When I was on the road,[3] and I can only explain this to you, we have people come into our town every couple of years on what could be described as a fairly regular basis and dump dead bodies. We have people steal cars. We have burglars, and we have people that carry weapons they shouldn't have. I would  it wouldn't be smart for me to come up with one area or the other. I chose to go the narcotics route as my first theme of questioning.
I think that that was  I would agree that that would probably be a good choice for me to make, and it was looking like that would be a good place to start, but I in no way decided that that was exactly what I thought was going on at that point, no.
We cannot find that the entirety of this investigation was unreasonably extended, or that, under these circumstances, the officer's conduct was more intrusive than necessary for an investigative stop. Dickey, supra, 152 N.J. at 478, 706 A.2d 180; Terry, supra, 392 U.S. at 20, 88 S.Ct. at 1875, 20 L.Ed.2d at 905.
*285 We also part company with the trial court's conclusion that Baum's smoking-weed admission was insufficient to justify reasonable suspicion that drugs were in the car. "A seizure cannot  we emphasize cannot  be justified merely by a police officer's subjective hunch." Davis, supra, 104 N.J. at 505, 517 A.2d 859. Reasonable suspicion requires objective justification, Elders, supra, 386 N.J.Super. at 224, 899 A.2d 1037, but "`is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" State v. Stovall, 170 N.J. 346, 370, 788 A.2d 746 (2002) (quoting United States v. Valentine, 232 F.3d 350, 353 (3d Cir.2000), cert. denied, 532 U.S. 1014, 121 S.Ct. 1748, 149 L.Ed.2d 670 (2001)). There is no "easy formula" by which to measure reasonable and articulable suspicion, Stovall, supra, 170 N.J. at 361, 788 A.2d 746, and thus such a determination is highly fact sensitive. State v. Nishina, 175 N.J. 502, 511, 816 A.2d 153 (2003).
Baum's admission that "they were smoking weed" earlier, was not limited to that statement. She also stated that "whether he [presumably referring to Moore] came back with any, I don't know." Considering the inconsistent stories regarding how and why the group traveled to New York, Baum's admission together with her nervousness would cause a reasonable officer to suspect that drugs were in the car.
Because the officer had reasonable and articulable suspicion of drug possession at that point, he could threaten the use of a drug-sniffing dog. See Elders, supra, 386 N.J.Super. at 229, 899 A.2d 1037. When there is reasonable suspicion of drugs and the threat to call for a dog is calmly given, as it was here, such a threat will not be considered coercive. Id. at 232, 899 A.2d 1037.
We reject the trial court's conclusion that the threat was coercive because it was linked to preventing the scaring of the child in the vehicle. Under the circumstances, the child's presence was a consideration that was properly raised by the officer. On this record, it can hardly be considered the type of remark that would have overwhelmed Baum's free will. State v. Burris, 145 N.J. 509, 525, 679 A.2d 121 (1996); State v. Galloway, 133 N.J. 631, 655, 628 A.2d 735 (1993).
As the overriding question is reasonableness, we specifically decline to parse this investigation too finely. However, we cannot ignore one improper question asked by the officer. Baum and Reese are Caucasions and Moore is African-American. Reese inappropriately asked whether the father of Baum's unborn child was in the car. This question was irrelevant to any motor vehicle or possible criminal investigation and should not have been asked.
Finally, we reject defendants' contention that Baum was subject to custodial interrogation and should have been given Miranda warnings. Roadside questioning of a motorist detained pursuant to a traffic stop does not constitute "custodial interrogation" that must be preceded by Miranda warnings. Hickman, supra, 335 N.J.Super. at 631, 763 A.2d 330. Only if Baum's detention was unreasonable, would it amount to a "de facto arrest" implicating Miranda. Dickey, supra, 152 N.J. at 479, 706 A.2d 180.
While the officer isolated Baum from her fellow passengers by having her stand in front of the patrol car, she was within view of the Toyota, visible by her passengers, not handcuffed, humiliated, searched, or confined in the police car. Ibid. We decline to criticize this form of separation. Indeed, our courts recognize the need to permit sequestration of witnesses to "discourage collusion and expose contrived testimony." E.g., Morton Bldgs., Inc. v. Rezultz, Inc., 127 N.J. 227, 233, 603 A.2d 946 *286 (1992). Accordingly, we do not find the defendants' investigative detention to be unreasonable, and we reject the Fifth Amendment argument.
Therefore, we conclude that Baum's admission, after her arrest, that there were drugs in the car and that Moore had carried guns in the past, caused the officer's reasonable suspicion to ripen into probable cause. Considering the location of the vehicle, the time of night, and that there were two other passengers in the vehicle, we find that exigent circumstances made it impracticable to obtain a warrant and consequently the vehicle was properly searched at the scene. State v. Colvin, 123 N.J. 428, 437, 587 A.2d 1278 (1991); State v. Alvarez, 238 N.J.Super. 560, 568, 570 A.2d 459 (App.Div.1990). Accordingly, the evidence was not unreasonably seized and may be used in the State's prosecution against defendants.
Reversed and remanded for further proceedings.
NOTES
[1] This stop was videotaped. The tape was shown to the jury and explained by the arresting officer. The following facts are drawn from the arresting officer's testimony and the videotape.
[2] It should be noted that the trial court was overly concerned with the subjective intentions of Reese. "The proper inquiry for determining the constitutionality of a search and seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent." State v. Bruzzese, 94 N.J. 210, 219, 463 A.2d 320 (1983); State v. Alston, 279 N.J.Super. 39, 43, 652 A.2d 195 (App.Div.1995). "The Fourth Amendment proscribes unreasonable actions, not improper thoughts." Bruzzese, supra, 94 N.J. at 219, 463 A.2d 320.
[3] At the time of the suppression motion, the officer had been promoted to Lieutenant.