18 A.3d 179

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. GERMAINE A. HANDY, DEFENDANT–
RESPONDENT.

Argued December 1, 2010—Decided April 26, 2011.

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for appellant (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Stephen P. Hunter,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice LONG delivered the opinion of the Court.

Germaine A. Handy was arrested as a result of incorrect information regarding the existence of a warrant, conveyed by a police dispatcher to an officer who had stopped Handy for riding his bicycle on the sidewalk in violation of a city ordinance. At issue before us is whether evidence uncovered in the ensuing search should be suppressed. We answer that question in the affirmative. The dispatcher had, in hand, a ten-year-old warrant for a California resident that did not match the spelling of Handy's

name and bore a different date of birth, yet she advised the officer on the scene that there was an outstanding warrant for Handy. That conduct by the dispatcher, an integral link in the law enforcement chain, was objectively unreasonable and violated the Fourth Amendment to the United States Constitution and Article I, Paragraph 7, of the New Jersey Constitution, requiring suppression of the evidence.

I.

On September 13, 2005, at approximately 7:40 p.m., Millville Special Officer Anthony Sills stopped a group of individuals for riding their bicycles on the sidewalk, in violation of a city ordinance. Officer Sills called for back-up and Officer Carlo Drogo, who was on routine patrol, responded. Because none of the bicyclists had identification, Officer Drogo asked for their names and dates of birth.

Defendant, Germaine A. Handy, was one of the individuals questioned by Officer Drogo. He provided his name as Germaine Handy, which he spelled out, along with his address—218 East Broad Street, Millville, New Jersey, and his date of birth—March 18, 1974. Officer Drogo recorded Handy's information and radioed police dispatch with Handy's name and date of birth for a warrant check. The police dispatcher informed Officer Drogo that there was an outstanding warrant for Handy. Based on that information, Officer Drogo placed Handy under arrest and handcuffed him.

A search incident to the arrest led to the recovery of drugs. Subsequently, the police dispatcher informed Officer Drogo that there was a discrepancy between the date of birth Handy had given (March 18, 1974) and the date of birth listed on the warrant (March 14, 1972).

When Officer Drogo arrived at headquarters with Handy he attempted to verify the existence of the warrant himself. In doing so, he ascertained that, in addition to the birth date discrepancy, the warrant, which was about ten-years old, had been issued to

Jermaine O. Handy with an address on W. 73rd Street in Los Angeles, California.

Officer Drogo then called the Chesterfield Township Municipal Court which had issued the warrant, reached an automated voice-mail, left a message, but did not receive a reply. In light of what he had learned, Officer Drogo did not process Handy on the warrant, presumably because he concluded that Handy was not the subject of the warrant; instead, he charged him with the drug offenses and subsequently released him.

Cumberland County Indictment No. 05–12–1153 charged Handy with one count of third-degree possession of a controlled danger-ous substance (cocaine) in violation of *N.J.S.A.* 2C:35–10(a)(1). Handy moved to suppress the evidence against him on the ground that the police acted unreasonably in linking him to the warrant. The State countered that the arresting officer was entirely reason-able in relying on the police dispatcher.

The trial court denied Handy's motion and, in ruling, found, as a matter of fact, that the dispatcher was aware of the discrepancies between the warrant and the information conveyed by Officer Drogo. Although the trial court characterized the dispatcher's actions as unreasonable, it noted that the more important factor was that the arresting officer's actions were entirely reasonable in light of the information presented to him.

Handy ultimately entered a plea to the indictment and to an unrelated indictment. He was sentenced in accordance with the plea agreement to an aggregate three-year term. Thereafter, he appealed the denial of the suppression motion. The Appellate Division reversed. *State v. Handy,* 412 *N.J.Super.* 492, 494, 991 *A.*2d 281 (App.Div.2010). In ruling, the panel agreed with the trial court that the police dispatcher acted unreasonably when she conveyed the warrant information to Officer Drogo, despite sub-stantial discrepancies, and that Officer Drogo was entirely reason-able in his response. *Id.* at 494, 504, 991 *A.*2d 281. The panel parted company from the trial court in connection with the ultimate question of whether the reasonableness of the arresting

officer somehow insulated the search from suppression and reject-
ed the State's contention that the deterrent effect of suppression
based on the dispatcher's conduct would be minimal. *Id.* at 504,
991 *A.*2d 281. Judge Waugh, writing for the panel, said:

> Here, the police were responsible, through the unreasonable actions of the police
> dispatcher, for conveying incomplete and inaccurate information to the arresting
> officer. If the citizens' right to be free from unreasonable search and seizure is to
> be vindicated, then the exclusionary rule must be applied beyond the officer in the
> field and to the police employee who acts unreasonably in supplying critical, but
> inaccurate or incomplete, information under circumstances such as those before us.
> [*Ibid.*]

The State sought certification, which we granted. *State v.
Handy*, 203 *N.J.* 95, 999 *A.*2d 463 (2010). We now affirm.

## II.

The State argues that: the conduct of both the arresting officer
and the dispatcher was entirely reasonable; even if the dispatch-
er's conduct is deemed unreasonable, the evidence should not be
suppressed because the exclusionary rule is only triggered by
police action that is deliberate, reckless, or systemic; and, in this
case, the goal of deterrence would not be advanced by suppressing
the evidence against Handy.

Handy counters that the Appellate Division was correct in:
viewing the police dispatcher as part of the police department
family; characterizing her conduct as objectively unreasonable;
attributing her unreasonable actions to the department as a whole;
and suppressing the evidence under the exclusionary rule.

## III.

In reviewing a motion to suppress, an appellate court
"must uphold the factual findings underlying the trial court's
decision so long as those findings are supported by sufficient
credible evidence in the record." *State v. Elders*, 192 *N.J.* 224,
243, 927 *A.*2d 1250 (2007) (quoting *State v. Elders*, 386 *N.J.Super.*
208, 228, 899 *A.*2d 1037 (App.Div.2006)) (internal quotation marks
omitted). A trial court's findings should not be disturbed simply

because an appellate court "might have reached a different conclusion were it the trial tribunal." *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964). However, a trial court's legal conclusions are not afforded such deference; appellate review of legal determinations is plenary. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995). Here, the trial court's factual findings, in particular that the dispatcher was aware of the discrepancies between the warrant and what Officer Drogo had told her, were accepted by the Appellate Division and we adopt them as well. What is before us is purely a legal question: whether those facts warrant suppression.

## IV.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[*U.S. Const.* amend. IV.]

A consequence for violating the Fourth Amendment is the so-called exclusionary rule, "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Leon,* 468 *U.S.* 897, 906, 104 *S.Ct.* 3405, 3412, 82 *L.Ed.*2d 677, 687 (1984) (quoting *United States v. Calandra,* 414 *U.S.* 338, 348, 94 *S.Ct.* 613, 620, 38 *L.Ed.*2d 561, 571 (1974)). In addition to deterrence, the exclusionary rule "enabl[es] the judiciary to avoid the taint of partnership in official lawlessness," and "assur[es] the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." *Calandra, supra,* 414 *U.S.* at 357, 94 *S.Ct.* at 624, 38 *L.Ed.*2d at 576–77 (Brennan, J., dissenting). As Justice Clark, writing for the Su-

preme Court in *Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961), declared:

> There are those who say ... that under our constitutional exclusionary doctrine "[t]he criminal is to go free because the constable has blundered." *People v. Defore* [242 *N.Y.* 13, 150 *N.E.* 585, 587, *cert. denied,* 270 *U.S.* 657, 46 *S.Ct.* 353, 70 *L.Ed.* 784 (1926)]. In some cases this will undoubtedly be the result. But, ... "there is another consideration—the imperative of judicial integrity." [*Elkins v. United States,* 364 *U.S.* 206, 222, 80 *S.Ct.* 1437, 1447, 4 *L.Ed.*2d 1669, 1680 (1960)]. The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence....
>
> ....
>
> The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest. Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision [to apply the rule to the States], founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.
>
> [*Id.* at 659–60, 81 *S.Ct.* at 1693–94, 6 *L.Ed.*2d at 1092–93 (footnotes omitted).]

Without an exclusionary rule, the Fourth Amendment "is of no value, and ... might as well be stricken from the Constitution." *Weeks v. United States,* 232 *U.S.* 383, 393, 34 *S.Ct.* 341, 344, 58 *L.Ed.* 652, 656 (1914).

In parallel language, our own constitution protects our citizens from unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.
>
> [*N.J. Const.* art. I, ¶ 7.]

▮ At issue in this matter is the execution of a warrant. In that connection, the basic test under both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7, of

the New Jersey Constitution is the same: was the conduct objectively reasonable in light of "the facts known to the law enforcement officer at the time of the search." *State v. Bruzzese,* 94 *N.J.* 210, 221, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695–96 (1984); *see also United States v. Ramirez,* 523 *U.S.* 65, 71, 118 *S.Ct.* 992, 996, 140 *L.Ed.*2d 191, 198 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." (citation omitted)). That standard affords the police necessary latitude to respond to criminality while deterring unreasonable conduct and protecting the citizens from government overreaching.

## V.

All parties agree that the aforementioned standard of objective reasonableness is the polestar for our inquiry. They differ over how the application of that standard plays out.

### A.

The State first argues that the conduct of both the arresting officer and the dispatcher was reasonable, and thus, no further analysis is required. Like the trial court and the Appellate Division, Handy disagrees, as do we. Although we cannot quarrel in any way with Officer Drogo's behavior, the dispatcher's actions were plainly unreasonable. Despite the fact that the warrant was over ten years old and referenced Jermaine Handy, a California resident, not Germaine Handy *and* bore a different date of birth, the dispatcher told Officer Drogo that the warrant was issued for Handy.

There was nothing reasonable about that conduct in light of what the dispatcher actually knew. Indeed, there were two reasonable paths for her: one was to tell Officer Drogo about the information on the warrant she had before her so that he could probe the issue further with Handy, the other was to say that there was no warrant matching the information she had been

given. She chose neither course, deciding instead to tell Officer Drogo that there was an outstanding warrant against the errant Millville bicyclist who had been stopped for riding on the sidewalk, thus precipitating the arrest that could not otherwise have occurred in the face of an ordinance violation, and the cascade of events that followed.

When the actions of the dispatcher, given the facts she knew at the time, are tested against the "touchstone of reasonableness," *Ramirez, supra,* 523 *U.S.* at 71, 118 *S.Ct.* at 996, 140 *L.Ed.*2d at 198, her conduct fell short. Although she had before her every reason to doubt the existence of a warrant for this defendant, she reported the opposite and did not make Officer Drogo aware of the real facts in the matter. Like the courts below, we have no difficulty in concluding that that conduct was constitutionally infirm.

## B.

Alternatively, the State contends that even if the dispatcher's conduct is deemed unreasonable, suppression is unwarranted. In particular the State, citing *Herring v. United States,* 555 *U.S.* 135, ———, 129 *S.Ct.* 695, 702, 172 *L.Ed.*2d 496, 507 (2009), argues that the conduct was not deliberate, reckless, grossly negligent, or evidential of systemic carelessness and, under those circumstances, the deterrence rationale of the exclusionary rule would not be advanced by suppression.

In *Herring,* the Supreme Court addressed the application of the exclusionary rule to conduct by one who was not the officer executing a warrant. *Id.* at ———, 129 *S.Ct.* at 698, 172 *L.Ed.*2d at 502. There, a county sheriff's investigator asked the county warrant clerk to check for any outstanding warrants against Bennie Dean Herring who had presented himself at the local impound lot to retrieve some personal items. *Ibid.* The sheriff's officer, who knew that Herring had had prior criminal involvement, was advised that there were no warrants. *Ibid.* At the officer's behest, the clerk checked with her counterpart in a

neighboring county who responded that there was, in fact, a warrant for Herring. *Ibid.* The first clerk conveyed that information to the officer who arrested and searched Herring and his vehicle uncovering drugs and a weapon. *Ibid.* As it turned out, however, the warrant had been recalled five months earlier. *Ibid.* That information should have been, but was not, entered into the computer database. *Ibid.* By the time the clerk realized what had happened, Herring had already been arrested and searched. *Id.* at ——, 129 *S.Ct.* at 698, 172 *L.Ed.*2d at 502–03.

The trial court denied Herring's motion to suppress the evidence against him. *Id.* at ——, 129 *S.Ct.* at 699, 172 *L.Ed.*2d at 503. On appeal, the Eleventh Circuit affirmed that decision declaring that, because the error was not reckless or deliberate, the exclusionary rule was not triggered. *Ibid.* In affirming, the United States Supreme Court asserted that an error arising "from nonrecurring and *attenuated* negligence is ... far removed from the core concerns" that led to the adoption of the exclusionary rule. *Id.* at ——, 129 *S.Ct.* at 702, 172 *L.Ed.*2d at 507 (emphasis added). Moreover,

> police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.
>
> [*Ibid.*]

According to *Herring,* because the bookkeeping error at issue was isolated negligence attenuated from the arrest, and because reliance on the errant database by the officer was not objectively unreasonable, the deterrent effect of suppression was minimal, such that the principles underlying the exclusionary rule would not be advanced thereby. *Id.* at ——, 129 *S.Ct.* at 704, 172 *L.Ed.*2d at 509.

In *Herring,* the Supreme Court expanded on its earlier decision in *Arizona v. Evans,* 514 *U.S.* 1, 115 *S.Ct.* 1185, 131 *L.Ed.*2d 34 (1995). *Herring,* 555 *U.S.* at ——, 129 *S.Ct.* at 701–02, 172 *L.Ed.*2d at 505–06. In *Arizona v. Evans,* the defendant was

arrested and searched after a computer check during a routine traffic stop indicated, incorrectly, that there was an outstanding warrant against him. *Evans, supra,* 514 *U.S.* at 4, 115 *S.Ct.* at 1188, 131 *L.Ed.*2d at 39–40. The defendant was charged with a possessory drug offense as a result of the search and moved to suppress on the ground that the drugs were the fruit of an unlawful arrest because the warrant had been quashed before he was arrested. *Id.* at 4–5, 115 *S.Ct.* at 1188, 131 *L.Ed.*2d at 40–41.

After the Arizona courts split over the issue, *id.* at 6, 115 *S.Ct.* at 1188–89, 131 *L.Ed.*2d at 41, the United States Supreme Court declared that where the mistaken conduct that led to the arrest was attenuated—that is, attributable to a judicial employee who had "no stake in the outcome of particular criminal prosecutions"—suppression would not deter police misconduct and thus application of the exclusionary rule would be unwarranted. *Id.* at 15, 115 *S.Ct.* at 1193, 131 *L.Ed.*2d at 47. The difference between *Arizona v. Evans* and *Herring* is the degree of attenuation: the former involved a non-police database and the latter a police-related one. In both cases, the actions of the law enforcement officers in relying on the databases was deemed objectively reasonable. *See Herring, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 700, 172 *L.Ed.*2d at 504; *Evans, supra,* 514 *U.S.* at 15–16, 115 *S.Ct.* at 1194, 131 *L.Ed.*2d at 47.

The State properly concedes that this is not an *Arizona v. Evans* case in that the dispatcher was not attenuated from the arrest, but was an integral link in the law enforcement chain. *See, e.g., United States v. Shareef,* 100 *F.*3d 1491, 1502–03 (10th Cir.1996) (holding dispatcher part of law enforcement for exclusionary rule deterrence purposes); *State v. Allen,* 269 *Neb.* 69, 690 *N.W.*2d 582, 591 (2005) (holding dispatcher "adjunct to law en- forcement" team and distinguishable from court employee in *Arizona v. Evans* ). The State nevertheless argues that under *Herring,* the dispatcher's mistake was not such as to warrant suppression.

## C.

 It is axiomatic that our interpretation of our own constitution will not always conform with the view of the federal courts. Indeed, although we look to federal interpretation of the United States Constitution as a guide, we do not view it as requiring lockstep. Thus, we often interpret our own constitution in such a way as to provide greater protections for our citizens than would its federal counterpart. *See, e.g., State v. Pierce,* 136 *N.J.* 184, 208–09, 642 *A.*2d 947 (1994) (refusing to adopt blanket rule permitting warrantless automobile searches incident to motor vehicle arrests); *State v. Hempele,* 120 *N.J.* 182, 215, 576 *A.*2d 793 (1990) (finding privacy interest in curbside garbage); *State v. Novembrino,* 105 *N.J.* 95, 157–58, 519 *A.*2d 820 (1987) (rejecting "good faith" exception to exclusionary rule); *State v. Hunt,* 91 *N.J.* 338, 345–48, 450 *A.*2d 952 (1982) (finding privacy interest in phone billing records).

We make that point in light of the robust criticism that *Herring* has drawn. Indeed, many scholars and treatise writers fault *Herring* for unjustifiably watering down Fourth Amendment protections and, in particular, for failing to consider the non-deterrent rationales underlying the exclusionary rule. *See, e.g.,* Albert W. Alschuler, *Herring v. United States: A Minnow or a Shark?,* 7 *Ohio St. J.Crim. L.* 463, 463 (2009); Thomas K. Clancy, *The Irrelevancy of the Fourth Amendment in the Roberts Court,* 85 *Chi.-Kent L.Rev.* 191, 191–92 (2010); George M. Dery, III, *Good Enough for Government Work: The Court's Dangerous Decision, In Herring v. United States, to Limit the Exclusionary Rule to Only the Most Culpable Police Behavior,* 20 *Geo. Mason U. C.R. L.J.* 1, 27–28 (2009); Wayne R. LaFave, *The Smell of Herring: A Critique of the Supreme Court's Latest Assault on the Exclusionary Rule,* 99 *J.Crim. L. & Criminology* 757, 758, 765–66 (2009); *see also* Wayne R. LaFave, *Search and Seizure,* § 1.6 at 40–41 (rev. 4th ed. Supp.2010–11).

We note as well that the parties are sharply divided over whether adopting *Herring* would violate our decision in *Novembri-*

*no,* rejecting the "good faith" exception of *Leon.* As might be expected, the State argues that *Herring* does not run afoul of *Novembrino* and defendant asserts the contrary.

We need not assess whether *Herring* can be reconciled with our own constitutional standards for, like the Appellate Division, we conclude that this case would not be governed by *Herring,* in any event. *See Handy, supra,* 412 *N.J.Super.* at 501–02, 991 *A.*2d 281. *Herring's* focus, and that of *Arizona v. Evans,* was an attenuated clerical error in a database upon which police officials reasonably relied. *Herring, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 703–04, 172 *L.Ed.*2d at 507–08; *Evans, supra,* 514 *U.S.* at 15, 115 *S.Ct.* at 1193, 131 *L.Ed.*2d at 47. In both instances, the Court assessed the deterrent effect of suppression as minimal. *Herring, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 702, 172 *L.Ed.*2d at 507; *Evans, supra,* 514 *U.S.* at 15, 115 *S.Ct.* at 1193, 131 *L.Ed.*2d at 47.

Attenuation is not part of the factual calculus before us. First, the dispatcher was not attenuated from the arrest but was literally a co-operative in its effectuation along with the officer on the scene. Second, as far as we know, the database was entirely accurate and there is, in fact, an outstanding warrant for a Jermaine O. Handy of Los Angeles, California. What occurred here was that the dispatcher, with a presumably accurate database, simply provided Officer Drogo with wrong information when a reasonably prudent person would, at least, have advised him of the discrepancies so that he could verify the information himself.

Third, the minimal deterrent effect that the Supreme Court in *Herring* and *Arizona v. Evans* intuited would flow from suppression based on an attenuated "clerical error," is wholly unlike what is before us. Instead, suppressing the evidence garnered from this illegal search would have important deterrent value, would underscore the need for training of officers and dispatchers to focus on detail, and would serve to assure that our own constitutional guarantees are given full effect. As the Appellate Division pointed out:

> The police dispatcher is the crucial link between the officer in the field and police headquarters. The officer depends on receiving the correct information from the dispatcher, information such as whether there is or is not an outstanding arrest warrant for the person with whom the officer is then face to face. Misinformation either way has the potential to leave the officer either unaware that he or she is dealing with a dangerous criminal or arresting the wrong person.
>
> The need to avoid the former is obvious and clearly in the best interest of the police officer in the field, the need to avoid the latter finds its basis in the Fourth Amendment's protection of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See also N.J. Const.* art. I, ¶ 7. The police officer in the field and the citizen on the street both benefit from a police dispatch system that is free of unreasonable conduct by dispatchers who fail to ensure that they are providing the available information about outstanding warrants as accurately and completely as possible.
>
> [*Handy, supra,* 412 *N.J.Super.* at 502, 991 *A.2d* 281.]

What is critical to our analysis is that neither *Herring* nor *Arizona v. Evans* dispensed with the standard of "objective reasonableness" that governs the execution of a warrant. To the contrary, those decisions took pains to reaffirm that standard. *Herring, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 701, 172 *L.Ed.*2d at 505 (officer's conduct must be objectively reasonable); *Evans, supra* 514 *U.S.* at 15–16, 115 *S.Ct.* at 1194, 131 *L.Ed.*2d at 47 (holding officer's reliance on database objectively reasonable). In ruling as it did, on the effect of an attenuated clerical error in *Herring* and *Arizona v. Evans,* the Supreme Court addressed a niche that is simply not present here. Here, the dispatcher's slipshod conduct, which clearly would not have been tolerated had the officer committed it, was objectively unreasonable and thus failed to satisfy the Fourth Amendment or the New Jersey Constitution.

## VI.

The Fourth Amendment is a bulwark against the government's unwarranted intrusions into the daily lives of our fellow citizens. As interpreted by the dissent, it would provide little or no protection to the people it was intended to serve. First, the dissent's notion that the "urgency" of the situation facing the dispatcher justified her conduct is misguided. Officer Drogo was confronted with persons who had ridden their bicycles on the sidewalk, not suspected armed robbers, burglars, or rapists. If

ever there was a case in which the dispatcher had the luxury of time and care—this was it.

Second, the dissent's conclusion that a Fourth Amendment exclusionary rule analysis is limited to the conduct of the arresting officer is wrong. Under that construct, police operatives, like the dispatcher here, are free to act heedlessly and unreasonably, so long as the last man in the chain does not do so. Nothing in our jurisprudence supports that view.

Third, as we have said, the analysis under federal and state jurisprudence focuses on the objective reasonableness of the police conduct. Here, the dispatcher's notion, echoed by the dissent, that a warrant with a wrong name and a wrong date of birth, is close enough to justify the arrest of a citizen, fails to satisfy that standard. To be sure, "room must be allowed for some mistakes by police ...," *Illinois v. Rodriguez,* 497 *U.S.* 177, 186, 110 *S.Ct.* 2793, 2800, 111 *L.Ed.*2d 148, 159–60, (1990). But that principle bears with it an important caveat—that the police have behaved reasonably. *Ibid. See also State v. Green,* 318 *N.J.Super.* 346, 352, 723 *A.*2d 1012 (App.Div.1999) (holding reasonable but mistaken belief leading to arrest did not warrant suppression). The police dispatcher here was plainly unreasonable in failing to take further steps when she recognized that she did not have a match on the warrant check. As such, our own constitution requires suppression. One need not have pristine vision or the benefit of hindsight to know that that is so.

## VII.

The judgment of the Appellate Division reversing the order denying suppression is affirmed.

Justice HOENS, dissenting.

A lone Special Police Officer,[1] charged with responsibility for enforcing municipal ordinances, confronted six men, each of whom

---

[1] The modes and methods of the appointment, qualifications, training, powers and authority of special law enforcement officers are all governed by statute.

was violating the ordinance that prohibits riding a bicycle on the sidewalk. As he approached, intending to issue a summons to each of them, he called for backup and, by the time the responding patrolman arrived, he had managed to detain all of the men.

In order to issue the summonses, the officers needed basic information about each individual's name and address, but none of them had any form of identification. After asking each of them for their names and dates of birth, but lacking anything against which to verify the accuracy of the information that each provided, the patrolman radioed the information to the police dispatcher, seeking to learn whether any of the men was the subject of an outstanding warrant.

In searching multiple databases for a response about whether there were any active warrants for the six names that she had been given, the dispatcher found one that appeared, at least initially, to match. The dispatcher immediately alerted the patrolman that there was an active outstanding warrant for defendant. The patrolman, acting on that information, advised defendant about the warrant and placed him under arrest. In response, defendant raised no protest and did not suggest that he was not the subject of an outstanding warrant. In the search of his person that followed, the officer found narcotics and secured him in a patrol car.

Before the officer and defendant were able to return to the police station for processing on the charges, the dispatcher contacted the officer to alert him that there was a discrepancy between the information supplied by defendant and the information on the warrant. By that time, however, defendant had already been arrested and the illegal drugs he had in his possession had already been found.

There is no dispute about the differences between the information defendant had given and the identifying information in the

---

See *N.J.S.A.* 40A:14–146.8 to –146.18. A discussion of those particulars is neither relevant nor necessary to an analysis of this matter.

warrant that the dispatcher told the patrolman was a match. They are comprised of a single different letter in the spelling of defendant's first name and two different digits in the dates of birth. Although it is true that the person to whom the warrant was issued ten years earlier gave a California address, the warrant issued out of Trenton, a review of defendant's "arrest jacket" included several different birthdates and social security numbers that he had given to police in the past, and, as the State has pointed out to this Court, he has used the alternate spelling of his first name in the past.

The question before this Court is whether the drugs found in the search incident to defendant's arrest should be suppressed, a question that the majority answers in the affirmative. Applying the standard of objective reasonableness, *see United States v. Ramirez*, 523 *U.S.* 65, 71, 118 *S.Ct.* 992, 996, 140 *L.Ed.*2d 191, 198 (1998); *State v. Bruzzese*, 94 *N.J.* 210, 221, 463 *A.*2d 320 (1983), *cert. denied*, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984), the majority does not fault the action taken by the police officer, but instead rests its analysis on the shortcomings of the dispatcher.

The majority reasons that the dispatcher's conduct fell short because, when confronted with the differences between the information provided by defendant and that in the warrant, the dispatcher could have asked the officer to make further inquiry of defendant or could have reported that there were no matching warrants. Because the dispatcher failed to make either of those choices, the majority concludes that the decision to alert the officer about an outstanding warrant was "plainly unreasonable." *Ante* at 47, 18 *A.*3d at 184.

There are at least three problems with that reasoning. First, although the suggestion that the dispatcher could have asked for more clarification seems reasonable enough, it ignores the urgency of the situation faced by the dispatcher trying to run down information on six separate individuals then confronting the officers on the street.

Second, the suggestion that the dispatcher reasonably could have told the officer that there were no warrants overlooks the reality that many people, including defendant, provide different spellings of their names or different birthdates when approached by police. Defendant himself, according to the record, had previously provided varying names and other identifying information when arrested prior to the events now before this Court. The majority suggests that it would have been reasonable for the dispatcher to simply advise the officer on the scene that there was no match. Authorizing that response, however, is untenable, for it would mean that only a perfect match would qualify as worthy of comment, in spite of the reality that an individual might be providing misinformation intentionally. That approach serves no purpose but to vastly, and needlessly, increase the risk to the safety of the officer on the scene.

Third, the majority's approach leaves no room for the possibility of an innocent mistake, notwithstanding precedents holding otherwise from the United States Supreme Court, *see Illinois v. Rodriguez,* 497 *U.S.* 177, 186, 110 *S.Ct.* 2793, 2800, 111 *L.Ed.*2d 148, 159–60 (1990) (holding that "room must be allowed for some mistakes" by police, such that, if they are reasonable, police may act on facts "leading sensibly to their conclusions of probability"), and from this Court, *see Bruzzese, supra,* 94 *N.J.* at 218, 463 *A.*2d 320 (explaining that focus must be on overall reasonableness of police conduct). Likewise, the majority overlooks the numerous precedents in which good faith police mistakes were not fatal to a valid arrest. *See, e.g., State v. Diloreto,* 180 *N.J.* 264, 280, 850 *A.*2d 1226 (2004) (concluding that officer's reliance on erroneous National Crime Information Center was permissible within community caretaking rationale); *State v. Pitcher,* 379 *N.J.Super.* 308, 320, 878 *A.*2d 8 (App.Div.2005) (concluding that officer's reliance on motor vehicle data base was reasonable although data was in error), *certif. denied,* 186 *N.J.* 242, 892 *A.*2d 1288 (2006); *State v. Green,* 318 *N.J.Super.* 346, 352, 723 *A.*2d 1012 (App.Div.1999) (concluding that because arrest of defendant based on valid war-

rant that named another individual was valid, evidence found during arrest would not be suppressed).

More troubling is the majority's extension of the Fourth Amendment remedy of exclusion, which would appropriately apply had the police officer himself acted unreasonably, to the dispatcher's conduct. Alternately criticizing and distinguishing as irrelevant the analytical approach adopted by the United States Supreme Court when it considered similar factual circumstances, *see Herring v. United States,* 555 *U.S.* 135, ——, 129 *S.Ct.* 695, 702, 172 *L.Ed.*2d 496, 507 (2009), the majority concludes that suppression of the drugs found on defendant's person is necessary "to assure that our own constitutional guarantees are given full effect." *Ante* at 52, 18 *A.*3d at 187.

There is no doubt that police dispatchers serve an important role in law enforcement and that police officers must be able to rely on the information that dispatchers provide when carrying out their functions. But the majority's decision gives the narrowest possible reading to the relevant guidance from the United States Supreme Court, *see Herring, supra,* 555 *U.S.* at ——, 129 *S.Ct.* at 701–02, 172 *L.Ed.*2d at 505–06; *Arizona v. Evans,* 514 *U.S.* 1, 15, 115 *S.Ct.* 1185, 1193, 131 *L.Ed.*2d 34, 47 (1995), overlooking in the process that it is unlikely that applying the exclusionary rule will have its intended effect.

This is so for three reasons. First, the majority's analysis imputes to the officer the mistaken decision made by the dispatcher and imposes a remedy, designed to deter police misconduct, in spite of the fact that the officer, as all concede, did nothing unreasonable. Second, there is nothing in this record that suggests that the dispatcher's advice to the officer that there was a matching warrant was part of a larger plan or a regular effort to trample on the constitutional rights of defendant or anyone else and that corrective measures must therefore be imposed on all dispatchers by this Court. Third, there is little reason to believe that using the exclusionary rule in circumstances that amount to little more than a momentary and minor misreading will, as the

majority hopes, result in more training or better attention to detail. *See ante* at 52–53, 18 *A*.3d at 187. On the contrary, the more likely outcome will be that dispatchers will hesitate or will waste precious time double-checking minor discrepancies while increasing the risks faced by our law enforcement officers in the field who are awaiting information.

As our United States Supreme Court has held, "[t]he Constitution does not guarantee that only the guilty will be arrested," nor does it require the police to "perform an error-free investigation." *Baker v. McCollan,* 443 *U.S.* 137, 145–46, 99 *S.Ct.* 2689, 2695, 61 *L.Ed.*2d 433, 442–43 (1979). Rather, it demands that the arresting officer exercise " 'due diligence in making sure that the person arrested and detained is actually the person sought under the warrant and not merely someone of the same or a similar name.' " *Id.* at 146, 99 *S.Ct.* at 2695, 61 *L.Ed.*2d at 443 (quoting *McCollan v. Tate,* 575 *F.*2d 509, 513 (5th Cir.1978) (citing *Restatement (Second) of Torts* § 125, comment d (1965))). *See also Hill v. California,* 401 *U.S.* 797, 802, 91 *S.Ct.* 1106, 1110, 28 *L.Ed.*2d 484, 489 (1971) (holding that person mistakenly arrested by police who had probable cause to arrest another was validly arrested). That it might have been more reasonable for the dispatcher to make a different choice does not support the majority's conclusory pronouncement that "[t]here was nothing reasonable about [the dispatcher's] conduct[.]" *Ante* at 47, 18 *A*.3d at 184.

The exclusionary rule is a powerful and important tool designed to deter police misconduct. It is a remedy best reserved for circumstances in which there has been police misconduct or for behaviors, or patterns of behavior, that bespeak a deliberate, routine, or systemic violation of constitutional rights rather than, as here, a mistaken decision with which this Court, with the benefit of the pristine vision that hindsight provides, disagrees.

Notwithstanding the majority's argument to the contrary, *see ante* at 53–54, 18 *A*.3d at 187–88, the lens they use is precisely the pristine one illuminated by hindsight. To the majority, these are just a bunch of young fellows on their bicycles who posed no

threat at all to the officers confronting them and a situation that provided the dispatcher with "the luxury of time and care." *Id.* at 54, 18 *A.*3d at 188.

The unfortunate reality that our law enforcement officers face is far different, as our case law makes plain. The use of bicycles to procure and transport illegal narcotics, for example, is common-place. *See State v. Citarella,* 154 *N.J.* 272, 276, 712 *A.*2d 1096 (1998) (noting expert testimony that "it is common practice for drug purchasers to drive to Fort Lee, park their cars, and travel to New York on foot or bicycle to buy drugs"); *State v. Kazanes,* 318 *N.J.Super.* 421, 423, 724 *A.*2d 285 (App.Div.1999) (noting that drug transaction was conducted between individuals on bicycles); *State v. Hughes,* 296 *N.J.Super.* 291, 293, 686 *A.*2d 1208 (App.Div.) (noting expert testimony that "people either walking or bicycling between Camden and Gloucester City were usually carrying illegal drugs"), *certif. denied,* 149 *N.J.* 410, 694 *A.*2d 195 (1997).

More to the point for purposes of this appeal, this Court is well aware that bicycles can be and have been used to facilitate the commission of serious crimes, including carjacking, *State v. Harris,* 181 *N.J.* 391, 424–25, 859 *A.*2d 364 (2004), and murder, *State v. Johnson,* 120 *N.J.* 263, 273, 576 *A.*2d 834 (1990). To suggest that the officer who was confronted with these six men should have known that they were not "armed robbers, burglars, or rapists" and that there was no urgency requiring a prompt response from the dispatcher, *ante* at 53–54, 18 *A.*3d at 188, is to substitute the view as it now appears from the safe confines of an appellate chambers for the one faced every minute of every day by the officers on the streets.

For all of these reasons, I respectfully dissent.

*For affirmance*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, and ALBIN, and Judge STERN (temporarily assigned)—5.

*For reversal*—Justices RIVERA–SOTO and HOENS—2.