**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2123-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANDREW BENJAMIN,

     Defendant-Appellant.

_____

Submitted October 28, 2019 – Decided December 11, 2019

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-08-0960.

Joseph E. Krakora, Public Defender, attorney for appellant (Alison Stanton Perrone, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

After the trial court denied defendant Andrew Benjamin's motion to suppress evidence seized from his vehicle after a routine traffic stop, he conditionally pled guilty to one count of second-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b), and was sentenced in accordance with the plea agreement. On appeal, defendant raises the following issues for our consideration:

> POINT I
>
> [DEFENDANT]'S CONSENT TO SEARCH THE CAR WAS NOT VOLUNTARILY GIVEN.
>
> A. Legal Framework
>
> B. Under State v. King And The Totality Of The Circumstances, [Defendant] Did Not Voluntarily Consent To The Search Of His Car.
>
> C. This Court Should Expand the Requirements of King and Johnson To Guide Lower Courts and Law Enforcement In Ensuring That Consent Is Truly Voluntarily, Intelligently, and Knowingly Obtained.
>
> 1. Law Enforcement Should Be Required To Scrupulously Honor An Individual's Invocation Of His Or Her Right Not To Be Subject to A Warrantless Search Or Seizure.
>
> 2. To Ensure That Consent Is Knowing And Intelligent, This Court Should Require Law Enforcement To Advise Individuals That Their Decision Not To Consent Must Be Respected And That Anything Found

As A Result Of The Search May Not Be Used Against Them In A Criminal Prosecution.

3. To Further Ensure That Consent Is Knowing And Intelligent, This Court Should Require Law Enforcement To Advise Individuals As To Whether Or Not They Are Free To Leave After Refusing Consent.

Having reviewed defendant's arguments in light of the record and applicable law, we affirm.

I.

The following facts are gleaned from the testimony of Officer Peter Magnani of the South Plainfield Police Department (SPPD) at the suppression hearing, as well as the Mobile Video Recorder (MVR) footage captured during the search, both of which the trial court relied upon when rendering its June 21, 2016 written opinion and order denying defendant's motion to suppress.

According to Magnani, on April 29, 2014, shortly before 3:00 a.m., he was on patrol in a marked police vehicle and driving behind a gold Honda Accord in South Plainfield. Magnani testified that he observed the vehicle make a left turn, cross over the double yellow lines, and then make "a very wide right into [a] hotel parking lot." As soon as the vehicle was parked, Magnani conducted a motor vehicle stop.

A-2123-17T3

Magnani approached the driver's side to speak to defendant. Two passengers, later identified as Khalil Huggins and Dora Miller, were also in the car. Instead of lowering his window, according to Magnani, defendant "cracked his door a little bit to hand [Magnani] the insurance card."[1] Defendant, however, failed to produce his driver's license and vehicle registration, claiming he did not have them. Magnani also stated that defendant failed to search for the vehicle registration in the glove compartment or elsewhere in the vehicle, which he described as suspicious. Defendant instead provided Magnani with his name, birthday, and Social Security number. Magnani also testified that before he returned to his patrol car, he smelled marijuana through the cracked door of the vehicle.

Magnani transmitted the information defendant provided to an individual at dispatch who confirmed that defendant had a valid provisional New Jersey license. Within minutes, another officer arrived to provide backup. Magnani later approached the passenger side of the vehicle and Miller lowered the window to hand him the vehicle's registration. At this point, with the window open, Magnani detected "a very strong odor of raw marijuana" and immediately

_____

[1] In its June 21, 2016 written decision, the court noted that contrary to Magnani's testimony, the MVR footage demonstrated "that the driver's door appear[ed] to swing completely open at that time."

asked defendant, Huggins, and Miller to exit and move toward the back of the vehicle.

Magnani then completed a motor vehicle consent to search form which he read to defendant. The consent form stated in pertinent part that:

> I, [defendant], . . . having been informed of my constitutional rights, first, that I may require that a search warrant be obtained prior to any search being made; second, that I may refuse the consent to any search; third, that anything which may be found as a result of this search which is subject to seizure can and will be seized and may be used against me in a criminal prosecution; fourth, that I may require to be present during the search; and fifth, that I may withdraw my consent to search at any time. By consenting to this search, I hereby authorize . . . Magnani . . . and any other officer designated to assist to conduct a complete search of the vehicle under my control . . . .

Defendant initially expressed reluctance to consent to a search and asked Magnani "what happens if he . . . den[ies] consent." Magnani testified that he informed defendant that he was permitted to deny consent, and that if he did so, the officers would "probably end up towing the vehicle and . . . apply[ing] for a search warrant" in order to search the vehicle at a later time.

Defendant then signed and dated the consent form which further provided that defendant's "written permission [was] given . . . voluntarily and without threats or promises of any kind being made to" him. Magnani stated that

A-2123-17T3

defendant was "eager to get it over with quickly" so he could "get into the hotel." Magnani testified that defendant did not, however, waive his right to be present for the search.

Magnani and another officer searched defendant, Huggins, and Miller because they had a concern for their safety. According to Magnani, "[a]ny time that we do a consent search or suspect something, criminal activity is happening, we always search the subjects that are . . . in the vehicle prior . . . [to] turning our backs on them to go in the vehicle." When the officers searched the vehicle, they found a "wet wipes" container on the back seat which, according to Magnani, "was pretty much completely full of marijuana . . . [in] individual baggies" as well as "a small baggie with bullets in it" and a pair of scissors that appeared to have hardened marijuana on the blades.

During the search, Miller asked Officer Sikanowicz to retrieve her cell phone and other items from her purse. When doing so, Sikanowicz found a marijuana pipe in the purse. The officers then searched the trunk and discovered a white garbage bag, which Magnani nudged with his flashlight, revealing a loaded revolver. The officers also found a skull cap and a "Bloods[2] manuscript

---

[2] "The 'Bloods' is a criminal gang described by the New Jersey State Police as a franchise with numerous smaller gangs taking the 'brand name' of the gang and

or Bible," which Magnani described, based on his training and experience, as a "large manuscript that is given to new members of the gang" to memorize. Finally, the officers discovered a baseball bat under the front passenger seat.

Once the handgun was discovered, the officers placed defendant, Huggins, and Miller under arrest and transported them to "police headquarters for processing and booking." As Magnani prepared to search defendant at headquarters, defendant admitted that he had marijuana in his underwear where Magnani retrieved a small bag of marijuana and empty baggies, characterized by Magnani as "packaging materials."

Defendant was charged in a six-count indictment with second-degree conspiracy, contrary to N.J.S.A. 2C:5-2 (count one); first-degree gang criminality, contrary to N.J.S.A. 2C:33-29 (count two); fourth-degree possession of marijuana, contrary to N.J.S.A. 2C:35-10(a)(3) (count three); third-degree possession of marijuana with intent to distribute, contrary to N.J.S.A. 2C:35-5(a)(1) (count four); second-degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b) (count five); and second-degree

---

adopting the gang's symbols, ideology and terminology." State v. Dorsainvil, 435 N.J. Super. 449, 455 n.5 (App. Div. 2014).

possession of a weapon during the commission of a CDS offense, N.J.S.A. 2C:39-4.1(a) (count six).[3]

Defendants filed a motion to suppress all of the evidence seized by the officers in connection with the motor vehicle stop, asserting there was no initial motor vehicle violation justifying a stop, and the police never validly obtained consent to search the vehicle. As a result of the illegal stop, defendants contended "all evidence obtained by the police . . . is either the 'poisonous tree' itself or the 'fruit of the poisonous tree.'"[4]

At the suppression hearing, the State presented testimony from Magnani, as well as other evidence including the MVR. Defendants presented testimony from Lieutenant Wayne Diana, a retired SPPD officer, Janak Upadhyay, a manager at the hotel outside where the arrest occurred, Juan Tenreiro, an investigator from the Office of the Public Defender, and documentary evidence.

---

[3] Huggins was also charged with counts one through six, and Miller was similarly charged, with the exception of the gang criminality offense in count two. In a February 7, 2017 opinion and order, the court dismissed count two.

[4] On appeal, defendant does not challenge the constitutionality of the initial stop nor does he contend that the police did not have probable cause to search him based on the smell of marijuana that Magnani detected emanating from the vehicle.

Diana testified as to the standard operating procedures of the SPPD relating to the usage of MVR and officers' body microphones, and also stated that he was aware of a request to conduct a consent search on the night in question. Upadhyay testified regarding the hotel's surveillance system. Specifically, he stated that surveillance video footage is recycled after seven days, and that he had released footage to SSPD upon request in the past. He further testified that he did not remember whether the SPPD had requested the footage from the night of the incident.

Finally, Tenreiro testified that approximately six months after the incident, he photographed the scene of the arrest and visited the SPPD to review the evidence. Tenreiro also described an experiment he conducted in which he transferred the marijuana from the evidence bag into the container seized and brought it to another room in the SPPD. Tenreiro stated that while the marijuana smelled "very pungent" in the first room, he was unable to smell the marijuana from inside the closed container in the second room.

On June 21, 2016, in a forty-five-page written opinion and corresponding order, the court denied defendants' motion to suppress. In its written opinion, the court characterized Magnani's testimony to be "credible[,] . . . candid[,] and responsive." Further, the court concluded Magnani's "initial motor vehicle stop,

. . . approach of the vehicle, and . . . request . . . for the production of credentials were all appropriate given the totality of the circumstances . . . ."

Moreover, the court determined Magnani searched defendant "as a result of the probable cause established by the purported plain smell of raw marijuana." The court noted, however, "clear inconsistencies" between Magnani's testimony and the MVR footage.[5] For example, the court stated that in the MVR footage, the driver's door "appear[ed] to swing completely open" at the time Magnani testified that it was "cracked."

The court nevertheless found Magnani's testimony to be "credible[,] and attribute[d] the inconsistent testimony to the loss of memory that results from the passage of time." Given the inconsistencies, however, the court "weigh[ed] the MVR footage more heavily than . . . Magnani's sworn statements more than one year after the incident." The court determined that both Magnani's testimony and the MVR footage "support[ed] the contention that [Magnani] experienced an overwhelming smell of marijuana . . . which prompted him to demand that the [occupants] exit the vehicle," and that Magnani's search of defendant was justified.

---

[5] When making its factual findings, the court acknowledged that Magnani failed to turn on the MVR prior to the initial traffic violation, and also did not power on his body microphone for the first fifteen minutes of the encounter.

A-2123-17T3

Finally, the court concluded "that Magnani obtained valid consent to search the vehicle . . . from [d]efendant . . . ." Initially, the court noted that it was "troubled by the ineffective use of the MVR . . . technology," such as the failures by Magnani to memorialize the initial traffic violation on the recording and power on his body microphone for the first fifteen minutes of the incident. Considering the totality of the circumstances, however, the court determined that defendant "gave a valid and [voluntary] consent to have his vehicle searched by the officers" because he "asked questions regarding the scope of the search" and possessed "a clear understanding of the circumstances." In doing so, the court also found Magnani's statement that he would tow defendant's vehicle and apply for a warrant to be "neither threatening nor coercive, but merely an accurate description of future events."

As noted, defendant pled guilty to count five, second-degree unlawful possession of a weapon. Consistent with the plea agreement, the court sentenced defendant to a five-year term of incarceration with a forty-two-month period of parole ineligibility, pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), mandatory fines and fees, and dismissed the remaining charges. This appeal followed.

II.

Defendant first argues that the court committed error in denying his

motion to suppress because his consent to search the vehicle was not voluntary. Specifically, he maintains the court failed to analyze properly the factors enumerated in State v. King, 44 N.J. 346 (1965), when it concluded that his consent was voluntary under the totality of the circumstances. In this regard, he argues that the court did not consider that defendant was "already arrested" when he gave his consent, and that he "never affirmatively assisted the police officers." Defendant similarly contends that the court failed to acknowledge that defendant knew "that the search would result in the discovery of marijuana and the firearm," which demonstrated his consent was coerced. He further asserts that Magnani's refusal to accept his initial denial of consent rendered the consent involuntary. Finally, defendant argues that Magnani's statement that he would tow the vehicle and apply for a search warrant if defendant denied consent was not "a fair prediction of events that would follow," State v. Cancel, 256 N.J. Super. 430, 434 (App. Div. 1992), but rather, a "situation . . . instinct with coercion," Bumper v. North Carolina, 391 U.S. 543, 550 (1968). We disagree.

Generally, "a guilty plea represents a break in the chain of events" and prohibits a defendant from appealing any non-jurisdictional defects "that occurred prior to the entry of the guilty plea." Tollett v. Henderson, 411 U.S. 258, 267 (1973); see also State v. Taylor, 140 N.J. Super. 242, 244-45 (App.

Div. 1976).  The denial of a motion to suppress evidence, however, is an exception to this rule and "may be reviewed on appeal from a judgment of conviction notwithstanding that such judgment is entered following a [guilty plea]."  R. 3:5-7(d).  Essentially, this rule only applies when the motion to suppress is "based on the allegation of an unlawful search and seizure and not on other grounds."  Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 3:5-7(d) (2019) (citing State v. Greeley, 178 N.J. 38, 50-51 (2003)).

An appellate court reviewing a motion to suppress "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record."  State v. Handy, 206 N.J. 39, 44 (2011) (quoting State v. Elders, 192 N.J. 224, 243 (2007)).  "A trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'"  Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).  "Video-recorded evidence is reviewed under the same standard."  State v. Hagans, 233 N.J. 30, 38 (2018).  The court's legal conclusions, however, are reviewed de novo and not entitled to our deference.  Handy, 206 N.J. at 45.

Individuals are protected from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and Article I,

Paragraph 7 of the New Jersey Constitution. U.S. Const. amend. IV; N.J. Const., art. I, ¶ 7. While "[w]arrantless seizures and searches are presumptively invalid as contrary to the United States and the New Jersey Constitutions," there are a "few well-delineated exceptions to the warrant requirement," including validly obtained consent to search. State v. Pineiro, 181 N.J. 13, 19 (2004) (quoting State v. Maryland, 167 N.J. 471, 482 (2001)).

"Implicit in the very nature of the term 'consent' is the requirement of voluntariness." King, 44 N.J. at 352. Accordingly, "consent must be 'unequivocal and specific' and 'freely and intelligently given.'" Ibid. (quoting Judd v. United States, 89 U.S. App. D.C. 64, 66 (D.C. Cir. 1951)).

In King, the New Jersey Supreme Court listed the following nonexhaustive factors tending to indicate coerced consent:

> (1) that consent was made by an individual already arrested . . .; (2) that consent was obtained despite a denial of guilt . . .; (3) that consent was obtained only after the accused had refused initial requests for consent to search . . .; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered . . .; and (5) that consent was given while the defendant was handcuffed . . . .
>
> [Id. at 352-53 (citations omitted).]

The King court also listed the following opposing factors suggesting that a defendant's consent was voluntary: "(1) that consent was given where the accused had reason to believe that the police would find no contraband . . .; (2) that the defendant admitted his guilt before consent . . .; and (3) that the defendant affirmatively assisted the police officers . . . ." Id. at 353 (citations omitted). The Court, however, acknowledged that "[e]very case necessarily depends upon its own facts," and that "the existence or absence of one or more of the above factors is not determinative of the issue." Ibid.

Thereafter, in State v. Johnson, 68 N.J. 349, 353-54 (1975), our Supreme Court held that "where the State seeks to justify a search on the basis of consent," an "essential element" of its burden to show that consent was voluntary "is knowledge of the right to refuse consent." The Johnson court, however, did not require the police "to advise the person of his right to refuse to consent to the search" in a "non-custodial situation." Id. at 354. Rather, it merely required the State to demonstrate "knowledge on the part of the person involved that he had a choice in the matter." Ibid.

In State v. Carty, 170 N.J. 632, 646 (2002), the court noted that "the Johnson standard has not been effective in protecting our citizens' interest against unreasonable intrusions when it comes to suspicionless consent searches

15                                                    A-2123-17T3

following valid motor vehicle stops." The Carty court explained that "consent searches following valid motor vehicle stops are either not voluntary because people feel compelled to consent for various reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search." Ibid. Accordingly, it "expand[ed] the Johnson . . . standard and [held] that unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional." Id. at 647.

After considering the record in light of King, Carty, and Johnson, we reject defendant's claim that the court improperly considered the King factors or that his consent to search the vehicle was not voluntary. In this regard, although the court acknowledged that defendant initially refused consent and that the search resulted in a seizure of contraband that defendant "must have known would be discovered," it also recognized that "the King factors are only guideposts." Further, the court noted that at the time defendant consented to the search, he was not yet handcuffed, and he was informed multiple times of his right to refuse consent. Rather than rigidly evaluating and weighing the King factors, the court properly determined that "under the totality of the

16

circumstances . . . [d]efendant gave . . . valid and voluntary consent" to the search because he "asked questions regarding the scope of the search . . . and eventually provided consent with a clear understanding of the consequences."

We also reject defendant's claim that the court incorrectly characterized Magnani's statement that if defendant refused consent, he "would tow [the] vehicle and apply for a search warrant" as "neither threatening nor coercive, but merely an accurate description of future events." Defendant argues that Magnani's statement "amounted to an 'announce[ment] in effect that [defendant] had no right to resist the search . . . .'" (quoting Bumper, 391 U.S. at 550). We disagree.

In Bumper, the defendant's family member consented to a search of a home based on a misrepresentation by the police that they had a search warrant. Bumper, 391 U.S. at 546, 50. As Magnani merely informed defendant that he would "apply for a search warrant," defendant's reliance on Bumper is misplaced. Instead, we agree with the trial court that Magnani's statement was not coercive, but simply a fair prediction of events to come in the investigation. See Hagans, 233 N.J. at 42; Cancel, 256 N.J. Super. 430, 434.

In Hagans, an officer stopped a vehicle for a motor vehicle violation, and while waiting for the driver to provide her driving documents, smelled burnt

marijuana in the vehicle. Hagans, 233 N.J. at 34. The officer handcuffed the driver and placed her in the back seat of his police vehicle. Ibid. In seeking the driver's consent to search the vehicle, the officer stated that "it would be a lot easier if [the defendant] would just make things easy," and read her the consent form. Id. at 34-35. After the officer explained the driver's rights to refuse consent and to withdraw consent at any time, she refused to consent to a voluntary search of her vehicle. Id. at 35. When the officer expressed his intention to "apply for a search warrant[,] . . . [which would] prolong the inevitable," the driver consented. Ibid. The officer then reread the consent form and the driver confirmed her consent. Ibid. In searching the vehicle, the officer discovered a bag of marijuana and a pistol. Ibid.

The Hagans court found sufficient support for the conclusion that the driver knowingly and voluntarily consented to the vehicle search. Id. at 42. In making this determination, it emphasized that the King factors are not dispositive, as "[t]he objective of a court undertaking a voluntariness analysis is to scrutinize 'the totality of the particular circumstances of the case.'" Id. at 42 (emphasis in original) (quoting King, 44 N.J. at 353). Additionally, the Hagans court noted that the police "had probable cause to support the issuance of a search warrant given the odor of burnt marijuana," and therefore, the officer's

statement that a search was "inevitable . . . was nothing more than a candid assessment of the likelihood that a judge would grant his application for a search warrant." Ibid. Accordingly, "despite the presence of several of the potentially coercive King factors," the totality of the circumstances demonstrated that the driver's consent was voluntary. Id. at 43.

We similarly conclude that Magnani's statement that he would "probably end up towing the vehicle and . . . apply[ing] for a search warrant," like the officer's statement in Hagans, was "'a fair prediction of events that would follow' rather than 'a deceptive threat . . . .'" Id. at 42 (quoting Cancel, 256 N.J. Super. at 434). Further, unlike in Bumper, Magnani made no representation that he was relying on a warrant to justify the search. See Bumper, 391 U.S. at 546. Instead, Magnani simply provided a "candid assessment" of the events that would follow defendant's refusal to consent to the search. Hagans, 233 N.J. at 42.

Additionally, the trial court noted that defendant consented only after asking Magnani "questions regarding the scope of the search." It further concluded Magnani's response provided defendant with "a clear understanding of the consequences," along with "an accurate description of future events." As such, and giving proper deference to the court's factual findings, we find

19                                                           A-2123-17T3

sufficient credible evidence in the record supporting the court's determination that defendant provided valid and voluntary consent to search the vehicle.

### III.

Defendant next argues that "given the progressive direction of New Jersey's jurisprudence in this realm," we should deviate from New Jersey's settled law relating to consent searches and "adopt the rule from our Fifth Amendment [Miranda[6]] jurisprudence . . . requir[ing] that once an individual asserts his right not to consent to a search, the police must immediately cease questioning and must not try to persuade the individual to relinquish his right." Defendant further asserts that "to ensure that an individual's waiver is knowing and intelligent," we should "add a two-fold requirement to Johnson's knowledge requirement: 1) that [o]fficers must inform individuals that a decision refusing consent will be respected; and 2) that officers must inform individuals that anything found as a result of the search can be used in evidence in a criminal prosecution against them." Finally, defendant contends that New Jersey courts should require police to advise individuals that have denied consent "that they are free to leave if they are, in fact, free to leave[,] as most citizens would not feel free to leave a scenario where [an officer] has advised that they are

---

[6] Miranda v. Arizona, 384 U.S. 436, 477 (1966).

 A-2123-17T3

impounding the citizen's vehicle."  We decline to extend New Jersey voluntary consent jurisprudence in the novel manner advocated by defendant, particularly given our role as an intermediate appellate court.

First, as noted, the Supreme Court in Carty recognized that "people feel compelled to consent [to searches following motor vehicle stops] for various reasons . . . ."  Carty, 170 N.J. at 646.  Thus, to address this shortfall in protecting the interest against unreasonable intrusions, the Court appropriately modified the Johnson standard to require police to have "a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop . . . ."  Id. at 647.  As the trial court in the present case correctly found, the police had a reasonable and articulable basis to stop defendant and continue his detention after the motor vehicle stop based on the smell of marijuana emanating from defendant's vehicle.

Further, it must be noted that Miranda applies only to custodial interrogations, and not to "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process . . . ."  Schneckloth v. Bustamonte, 412 U.S. 218, 232, 42 (1973) (quoting Miranda, 384 U.S. at 466); see also Johnson, 68 N.J. at 356 (Schreiber, J., concurring).  The Schneckloth court did not interpret Miranda to "extend the

need for warnings" to consent searches. Schneckloth, 412 U.S. at 232 (quoting Miranda, 384 U.S. at 477-78).

Further, in Johnson, while our Supreme Court acknowledged state courts' "power to impose higher standards" at the state level than at the federal level, it ultimately elected not to apply Miranda to consent searches, requiring only "knowledge of the right to refuse consent." Johnson, 68 N.J. at 353-54. Accordingly, given this guidance from our state's highest court, we decline to extend the requirement of Miranda warnings, and the additional prophylactic measures requested by defendant, to the voluntary consent circumstances presented by this record.

Moreover, as the State correctly notes, the Fourth and Fifth Amendments are grounded in different constitutional principles. While Miranda is based on "the need to protect the fairness of the trial itself," Schneckloth, 412 U.S. at 240, "[t]he protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." Id. at 242. Rather, "the Fourth Amendment protects the 'security of one's privacy against arbitrary intrusion by the police . . . .'" Ibid. (quoting Wolf v. Colorado, 338 U.S. 25, 27 (1949)). "[T]he right of each individual to be let alone" is a completely separate constitutional value from "the

ascertainment of truth." Ibid. (citing Tehan v. United States ex rel. Shott, 382 U.S. 406, 416 (1966)).

In sum, we conclude there was substantial, credible evidence in the record from the suppression hearing to support the court's factual findings that defendant's consent was voluntary under the totality of the circumstances. We further find no basis in the law as presently constituted, or the facts as presented in the record before us, to impose a requirement that the police instruct defendants that "anything found as a result of the search may not be used against them in a criminal prosecution," or that defendants be advised "as to whether or not they are free to leave after refusing consent."

To the extent we have not specifically addressed any of defendant's arguments, it is because we conclude they are "without sufficient merit to warrant discussion in a written opinion." R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2123-17T3